**JOINER v. JOINER et al.**

No. 11980.

Court of Civil Appeals of Texas. Dallas.

Oct. 26, 1935.

Rehearing Denied Nov. 23, 1935.

were married in January, 1881, and lived together as husband and wife until a few days after August 31, 1933; that on said date defendant came to Ardmore and induced plaintiff to agree to the execution of a joint will, disposing of their property for the benefit of their children; but that instead of writing a will, as agreed upon, defendant wrote a purported property settlement agreement, which plaintiff signed, thinking it was a joint will; that she signed the instrument without reading it, as she could not read without her glasses and had none at the time with which she could read, but confiding in the defendant, signed the instrument under said belief, and would not have done so otherwise. Plaintiff asserted ownership to one-half of all said properties, whether tested by the laws of Oklahoma or the laws of Texas, sought cancellation of the instrument in question, and recovery of one-half of said properties.

Defendant answered, denying plaintiff's allegations, and pleaded, as a full and final settlement of the property rights of the parties, the purported property settlement contract of August 31, 1933.

We assent to the statement at page four of defendant's brief, that "Virtually the only question to be submitted to the jury was whether or not the action of C. M. Joiner, in obtaining the signature of Mrs. L. A. Joiner to the said agreement was fraudulent." This question was submitted to the jury in a number of special issues, and based upon their answers, the court entered judgment that plaintiff take nothing, from which she appealed.

Prior to the divorce, plaintiff and defendant had lived together as husband and wife fifty-two years, at that time he was seventy-four years of age and she seventy; eight children had been born to them, seven then living, five daughters and two sons, all married and residing to themselves except one daughter, Miss Fannie, who remained with her mother in Ardmore.

Defendant, having matured plans to obtain, at Juarez, Mexico, a divorce from plaintiff and marry his then stenographer, went from Dallas, where he maintained his business headquarters, to Ardmore, his purpose being to obtain plaintiff's signature to said instrument, which was obtained, under the circumstances hereinafter detailed. Reaching Ardmore, defendant spent the night in the family home, the other occupants being plaintiff and their unmarried

Andrew B. Riddle, of Ardmore, Okl., Cantey, Hanger & McMahon, of Fort Worth, and Earl E. Hurt, of Dallas, for appellant.

Hamilton, Hamilton & Turner and D. A. Frank, all of Dallas, for appellees.

LOONEY, Justice.

Mrs. L. A. Joiner sued C. M. Joiner, her former husband, and others, seeking recovery of one-half of all property, real and personal, acquired during their marriage, that was owned and possessed on September 7, 1933, the date of the dissolution of the marriage by divorce. The city of Ardmore, Okl., was the domicile of the parties at the time of the transactions involved. Plaintiff alleged that she and defendant

daughter, Miss Fannie, who, having recently undergone an operation for tonsilitis, was sick. The next morning August 31, 1933, as the result of a conference between plaintiff and defendant, the instrument that forms the basis of this lawsuit was by the parties jointly executed. The instrument reads as follows: "Ardmore, Oklahoma. August 31st, 1933. This agreement made and entered into by and between C. M. Joiner and wife, L. A. Joiner, to-wit: In order to carry out the wishes of both parties to this agreement, it is agreed that the said C. M. Joiner, in addition to any and all moneys heretofore settled on his wife, L. A. Joiner, that he the said C. M. Joiner is to forever quitclaim any and all interest he now has or may hereafter acquire in and to the Home place situated at 601 North Washington Street, Ardmore, Okla., and is to pay all taxes now due and payable on said place, and to pay to the said L. A. Joiner $500.00 (Five Hundred Dollars) on the twentieth day of each month, first installment due and payable on October 20th, 1933, and a like amount on the twentieth day of each month thereafter as long as the said L. A. Joiner lives, and should the said C. M. Joiner die before the said L. A. Joiner, then his estate is to pay said amount, being the first charge on his estate, after funeral expenses are paid. For the above consideration, I, the said L. A. Joiner, the wife of C. M. Joiner, hereby relinquish all my right to participate in said property of C. M. Joiner further than as set out above, and relinquish and relieve the said C. M. Joiner of any and all obligation as to our marital relation and place implicit trust in him to dispose of the remainder of his estate as he thinks best. Witness our hands and seal this the day and date above written. (Signed) C. M. Joiner, Party of the First part, L. A. Joiner, Party of the Second Part. Witness: Fannie Joiner."

Plaintiff's contention is that the instrument agreed upon was a joint will; on the other hand, defendant's contention is that the instrument agreed upon, and as executed, was a property settlement.

Defendant concealed from plaintiff his intention to procure a divorce and marry Miss England, a young lady still in her twenties, who at the time served defendant as stenographer, and a few hours after securing the execution of the instrument, defendant left Ardmore, returned to Dallas, and, within a few days went to Juarez, Mexico where, on September 7, 1933, he purportedly obtained a divorce from plaintiff, and on the following day at Juarez, Mexico, he and Miss England were married. Of these happenings plaintiff was ignorant until she learned the facts, in a casual way, about October 1, 1933, and soon thereafter instituted this suit. No question has been raised as to the validity of the Juarez divorce, hence we are not called upon to make any ruling as to its validity, and do not do so.

We think a casual reading of the answers of the jury to the several issues submitted leaves the impression that they are conflicting, but that on closer scrutiny, in the light of pleading and evidence, the apparent conflict will disappear, and that the findings will be found reconcilable. Plaintiff alleged that defendant asked her to join him in the execution of a joint will, telling her that he would write such an instrument, and, believing he had written a will, signed the instrument. The petition also alleged that, after the instrument was written, defendant reiterated such statements, but testifying, plaintiff related only the facts preceding the writing of the instrument, as alleged, saying that having faith in defendant she signed the instrument without reading or having it read. The court, however, submitted both theories, though there was no evidence in support of the second, i. e., that representations were made by defendant after the instrument was prepared. In our opinion, the apparent conflict in the findings of the jury is due to the submission of the issues on the second theory. By questions Nos. 1, 3, 5, and 7, the court submitted issues as to the statements and agreements made prior to the writing of the instrument; question No. 1 being whether defendant requested plaintiff to join in the execution of a will; question No. 3, whether she agreed with him to execute a joint will; question No. 5, whether she believed it was a joint will when she signed it; and question No. 7, whether she would have signed it if she had known it was not a joint will. Questions Nos. 2, 4, and 6 were with reference to the second theory alleged, that is, as to statements and representations made by defendant after he prepared the instrument.

As these apparently conflicting findings are to be reconciled, we deem it necessary to set out at length the testimony of the parties on the controlling issues, which, in substance, is as follows: On August 30, 1933, defendant went to Ardmore, Okl., where the family resided, for the purposes,

as stated by himself, of agreeing with his wife on a settlement in regard to their property. He spent the night in the family home, but did not mention his business until the next morning. The only other person in the house at the time was their daughter, Miss Fannie, who was in bed sick from a tonsilitis operation the day before. Being asked by his counsel to state fully and completely the conversation between himself and Mrs. Joiner, and how he come to write the instrument in question, said: "Well, the next morning (August 31, 1933), I said to her, 'I want to have a talk with you,' and she tried to anticipate what it was about, and said 'What do you want?' and I said—well, I always called her Lydia— I says, 'You are a fine woman and a fine mother, and I respect and admire you for it, but we have never been congenial, we are not compatible, that is we look at life differently, and it will be impossible for us to live happily together.' She said she understood that and said 'What do you want?' and I says, 'I want a settlement, property settlement, and a settlement of our marital relations,' and she says, 'That will be alright,' and I says, 'How much?' I asked her how much she wanted, and she says, 'Well, Lum, you know I don't need anything but my home'—she always called me Lum—she says, 'I don't want much, we have everything we need here.' She had her own home, was getting about $125 a month, and Fannie also had a nice income. * * * I said, 'I will release any rights I may now have, or hereafter might acquire, in the home place (in Ardmore), and will pay all of the back taxes, which had not been paid, paying up all of the back taxes, * * * and would give her $500.00 a month.' She said, 'I am not used to that much,' and I says, 'You will have enough so you will not have to work, and you can give away $200 a month very easily, and you will enjoy that and you ought to have that much.' She says she didn't need it, and then we talked about this settlement, it would lift all responsibility off of her, and she said she understood that, and says, 'Lum, I don't want any of them (the children) to know anything about it. I may tell Fannie.' I said, 'Yes, I think you ought to tell Fannie, because we will have to get a witness to this agreement. We will get Fannie as a witness. * * *' Well, that is about the gist of it." The witness said a will was never mentioned, that he reduced the agreement to writing at the time, using his daughter's typewriter. Having left his glasses on the bus the day before, he used a pair his wife furnished him for the occasion. After writing the instrument, witness testified that he read it over very carefully to Mrs. Joiner, who said it was alright; that he handed the instrument to her, also handed her her glasses; she put them on, looked over the instrument for some time, and said, "Well, where will I sign it?" and I says, "I will sign it and you will sign under my name." He testified that she had glasses on and looked at the instrument long enough to have read it over, but did not read it out aloud; that witness did read it so that she could understand it, and she said that it was alright; that a copy of the instrument was furnished her. Witness testified that, after the instrument was written, his daughter Fannie witnessed the same; that she was sick at the time and on a bed in an adjoining room, about fourteen feet distant, during the conversation between himself and Mrs. Joiner; that after being signed, the instrument, as above stated, was taken into the room by the parties, and was signed by Miss Joiner while in bed; the witness testified that he did not tell his wife in detail the property that he owned, but that she thought he had a great deal more than he did have. Being asked if in his last letter to her he stated that he was virtually "busted," answered, "At one time I think I did, because it looked at one time like I was going into the hands of a receiver"; was asked, "You have answered that you didn't go into detail; did you tell her anything about your property? A. No. I don't think that was discussed. I don't think it was discussed about how much property I had, I really don't believe it was." After getting the signature of his wife to the instrument, witness testified that he left Ardmore for Dallas the same afternoon, and in about three days went to Juarez, Mexico, "to see about getting a divorce," and had left word with Miss England before leaving Dallas that, if successful in getting the divorce, he would wire her, that he did wire her on February 7, 1933, and they were married in Juarez on September 8, 1933. He testified that he had been engaged to marry Miss England for about a year, but did not tell plaintiff anything about his intentions in this respect.

The substance of the testimony of Mrs. Joiner in regard to the execution of the instrument is as follows: In answering ex parte interrogatories propounded by defendant, after testifying to the facts leading down to the point, she said: "He (Mr.

Joiner) stated that he would make his will, and I would take $500 and he would take what he wanted; that he would make his will to the seven children and the four grandchildren, and one other that he wanted to include, Miss Dea England, his stenographer, and give her $50 a month. I didn't read, nor did he read the contract to me. * * * I didn't read the contract or the agreement, and he didn't either, and I didn't know anything about it until after I learned he was married. * * * No, he didn't say a word about not being happy, or wanting any settlement with me. He said he wanted to settle up his estate and make his will. He asked me the question, if $500 would be as much as I could use, and that he would make his will to the seven children and the four grandchildren, and $50 a month to his stenographer, who he later married. * * * I stated that I wanted very little as he was to will the rest of the property to the children. * * * He asked if the $500 a month, in addition to what I was already receiving from the oil runs, would be sufficient, and I said yes, * * * if he made his will and gave his property to the children." Being asked if it was not a fact that she did not want very much property for herself, the witness said, "Sure, I had in my mind that he was going to make the will. He told me he was making his estate to the children, and I had that in my mind." Being asked why she did not ask him for more money, if $500 was not enough, she answered, "Because I didn't know what he was making me do. He did that and got away with it. He didn't discuss with me any settlement of the property rights or marital rights, and he didn't tell me anything about what was in the agreement, and said nothing about property settlement or marital rights with me." The witness testified, further, that she was not suffering for any of the necessaries of life, was comfortable, but wanted her rights. Being asked when she first became dissatisfied with the agreement of August 31, 1933, she answered, "About a week after he left, before I read the agreement and noticed what the agreement was, and noticed that things were in there that I knew nothing about, and that I had said nothing about"; that she talked first with her daughter Fannie in regard to the matter. Being asked if she had not always had the utmost confidence in Mr. Joiner and in his fairness, she answered, "I had confidence in him but he was not fair about giving me money. He

wasn't fair about putting confidence in me; he never told me anything, never confided in me. He wasn't fair about the agreement. I didn't know anything about it, didn't understand it. It wasn't read to me. He didn't read it to me. What he told me wasn't in the agreement at all." Being asked if when he agreed to settle $500 a month on her, she did not think it was fair, answered, "I thought when he was telling me that, he was fair, fair with his children and his property, as he told me he was giving all of the property to the children. He was going to make his will to his children before he died. He didn't want any commotion after he died. I thought that was fair; I thought that was in the agreement, and thought he was fair until what he had done." The witness testified, further, that, prior to August 31, 1933, there had been no separation, had never heard Mr. Joiner say anything about a separation; did not regard herself as being separated from him. Witness testified that she could not read without glasses, and did not have glasses on the day in question that she could read through; that her glasses were broken; that Mr. Joiner used a pair of her old glasses in writing the instrument. She was questioned by her counsel as follows at this point:

"Q. You testified in your deposition as to what he (Mr. Joiner) told you that he was going to write? A. Yes.

"Q. What did he tell you he was going to write? A. He was going to write a will for the five girls and the four grandchildren, and another, and that was Miss England.

"Q. How much was she to get? A. $50 a month.

"Q. Did he, after telling you that, write out this instrument? A. Yes.

"Q. At the time you signed it, what did you think it was? A. I thought I was signing a will.

"Q. Had you known that it was not a will, would you have signed it? A. No, sir.

"Q. Did you know that within the next few days he was going to Mexico and get a divorce? A. No, sir.

"Q. Had you known at the time he presented that instrument to you to sign that he was going down there to get a divorce, would you have signed it? A. No, sir, I would not.

"Q. Had you known that in a week or such a matter that he was going to marry

this young girl, would you have signed that instrument? A. No."

Miss Fannie Joiner, daughter of plaintiff and defendant, referred to in excerpts from their testimony, testified that she lived at Ardmore with her mother; that prior to her father's marriage to Miss England she had never heard that her mother and father were separated; that her father came to their home on August 30, 1933, and on that day witness was operated upon for tonsilitis, and on August 31st had fever; about noon that day the doctor visited and gave her a sedative which put her to sleep; that she knew nothing of her father having written the instrument, the first she knew of it was when he woke her up, and asked her to sign the document, which she did while sitting up in bed; that when she signed the document, asked her father, "What am I signing?" he said, "There is a copy on your mother's vanity and you can read it after I leave"; that he left the house in about 20 or 30 minutes after securing her signature; did not make any statement to her mother in the presence of witnesses in regard to the instrument; that she first learned, about October 1, 1933, that her father had married in Mexico. Being asked, "Did your mother tell you anything about what was in it (the instrument)?" she answered "No, she didn't."

"Q. Did she show it to you? A. She thought it was a will, she told me that, but I didn't read it until I heard he was married."

Being asked, "Q. Well, you got angry at him about marrying? A. Who wouldn't be angry?

"Q. I asked you if you didn't? A. Not exactly, no.

"Q. You didn't get mad at him about getting married or divorcing your mother? A. Sure, I was made angry about the divorce and marriage."

The foregoing is the material evidence bearing on the execution of the instrument in question.

The issues deemed material that were submitted to the jury, and their answers, are here set out at length, as follows: "Issue No. 1: Do you find from a preponderance of the evidence that on August 31, 1933, the defendant C. M. Joiner requested the plaintiff, Mrs. L. A. Joiner, to join with him in the execution of a joint will? (not answered). Issue No. 2: Do you find from a preponderance of the evidence that the defendant on the occasion of writing the contract dated August 31st, 1933, represented to the plaintiff, substantially, that it was a joint will providing that in case of her death he would have the possession and management of their joint property until his death, at which time it would then go to their children in equal shares; and that in case of his death she should have $500.00 per month during the remainder of her life, and that all the property was to be held together until her death, and then go to their children in equal shares? Answer 'yes' or 'no.' Answer: No. Issue No. 3: Do you find from a preponderance of the evidence that on August 31, 1933, the plaintiff, Mrs. L. A. Joiner, agreed with the defendant, C. M. Joiner, to join with him in the execution of a joint will containing the provisions substantially as set out in Special Issue No. 2? Answer 'yes' or 'no.' Answer: Yes. Issue No. 4: Do you find a preponderance of the evidence that the defendant on the occasion of writing the contract dated August 31st, 1933, represented to the plaintiff, substantially, that it contained the provisions specified in Special Issue No. 2? Answer 'yes' or 'no.' Answer: No. Issue No. 5: Do you find from a preponderance of the evidence that the plaintiff, Mrs L. A. Joiner, in signing the contract dated August 31st, 1933, believed it was the joint will of C. M. Joiner and herself? Answer 'yes' or 'no.' Answer: Yes. Issue No. 6: Do you find from a preponderance of the evidence that the plaintiff, Mrs L. A. Joiner, in signing the contract in question relied solely on representations, if any, of the defendant, C. M. Joiner, that it was their joint will? Answer 'yes' or 'no.' Answer: No. Issue No. 7: Do you find from a preponderance of the evidence that plaintiff, Mrs. L. A. Joiner, would not have signed the contract in question if she had known it was not the joint will of C. M. Joiner and herself? Answer 'yes' or 'no.' Answer: Yes. Issue No. 8: Do you find from a preponderance of the evidence that the plaintiff, Mrs. L. A. Joiner, would have refused to sign the contract in question if the defendant had told her that he was going to marry Miss Dea England? Answer 'yes' or 'no.' Answer: Yes."

The jury returned a verdict, with all questions answered except question No. 1. The court, however, over an objection urged by plaintiff, to the effect that the verdict was incomplete, received the same,

and later rendered judgment for the defendant.

The unanswered issue required the jury to find whether or not defendant requested plaintiff to join with him in the execution of a joint will. This, in our opinion, was simply an evidentiary fact bearing upon whether the parties had entered into such an agreement. The court regarded the matter as immaterial, and the parties agree that the question was evidentiary in nature, hence no error was committed by the court in receiving the verdict. However, on the verdict received, plaintiff moved for judgment, also filed motion for judgment non obstante veredicto; both being overruled, the court sustained defendant's motion for judgment.

Defendant urges various and sundry objections to the consideration of plaintiff's assignments and propositions. These are too numerous to mention in detail; they are overruled, however, as we believe the questions hereinafter discussed have been properly presented. In truth, assignment No. 5, to the effect that the court erred in refusing plaintiff's motion for judgment on the verdict, presents fundamental error and opens the entire case for review. The statute, article 2211 (amended by Acts 1931, c. 77, § 1 [Vernon's Ann.Civ.St. art. 2211]), mandatorily requires that "The judgments of the court shall conform to the pleadings, the nature of the case proved and the verdict, if any." Henne & Meyer v. Moultrie, 97 Tex. 216, 77 S.W. 607; 3 Tex. Jur. page 828 § 584 note 15. It follows, therefore, that a judgment out of harmony with the verdict is fundamentally erroneous.

We think it obvious that issues Nos. 2 and 4, in different forms, presented precisely the same question, requiring the jury to answer whether defendant, after the preparation of the instrument of August 31, 1933, "represented to the plaintiff substantially that it was a joint will, etc. * * *" These questions were answered in the negative, and we think correctly so, as the testimony of Mrs. Joiner is to the effect that, after the instrument was prepared by defendant, he neither read it to her, nor did she read it, but having faith in defendant, signed without reading or having it read; in other words, there was no evidence showing or tending to show that defendant made any representation, after the preparation of the instrument, as to what it was or what is contained. So, in view of this un-

disputed evidence, the answers of the jury to issues Nos. 2 and 4 could not have been otherwise. Their answer to No. 6, to the effect that, in signing the instrument plaintiff did not rely "solely on representations, if any, of the defendant, C. M. Joiner, that it was their joint will," is a mere corollary, deducible from answers previously made to issues Nos. 2 and 4, to the effect that, after the instrument was prepared, defendant made no such representations.

As thus understood, the answers of the jury to these issues (Nos. 2, 4, and 6) are not in conflict with their answers to any other issue, and, in our opinion, furnished no basis for the judgment rendered by the court. On the contrary, we think plaintiff's case was established, and that she was entitled to judgment on the answers to issues Nos. 3, 5, 7, and 8. As to issue No. 3, the jury found that, on the occasion in question, plaintiff and defendant entered into an agreement to execute a joint will, containing the provisions substantially as set out in special issue No. 2, i. e., "providing that in case of her death he would have the possession and management of their joint property until his death, at which time it would then go to their children in equal shares; and that in case of his death she should have $500.00 per month during the remainder of her life, and that all the property was to be held together until her death, and then go to their children in equal shares"; in answer to issue No. 5, the jury found that, in signing the instrument, plaintiff believed it was the joint will of herself and defendant; in answer to No. 7 they found that she would not have signed the instrument if she had known that it was not the joint will, as agreed upon; and in answer to No. 8, they found that she would have refused to sign the instrument if defendant had told her he was going to marry his stenographer, Miss England.

These findings are consistent with each other, are amply supported by evidence, are not in conflict with any other finding, and, in our opinion, established beyond question plaintiff's cause of action, entitling her to judgment.

Counsel for defendant say, in their brief, that "it is apparent from these questions and answers that the jury did not find the appellee C. M. Joiner guilty of fraud." The conclusion, in our opinion, is ines-

capable that the jury did convict defendant of want of candor and bad faith in securing the signature of his wife to the instrument, the effect of which was to find him guilty of fraud.

■ The relation of husband and wife is conspicuously one of confidence and trust, requiring the utmost good faith and frankness in their dealings with each other, and where it appears that either has been false to the other, a court of equity will afford appropriate relief. This is a general doctrine. Swearingen v. Swearingen (Tex.Civ.App.) 193 S.W. 442, 452 (parag. 18); Montgomery v. Montgomery, 41 Okl. 581, 139 P. 288, and authorities cited.

■ Defendant contends, further, that plaintiff is not entitled to avoid the instrument, in that she signed the same under the belief that it was a joint will as the result of a unilateral mistake. We do not think the doctrine of unilateral mistake has any application to the facts as found by the jury, in that they found, in effect, that the signing of the instrument by plaintiff was superinduced by defendant's bad faith and want of candor.

■ But, if it can be correctly said that the answers of the jury to the series of issues, Nos. 2, 4, and 6 are material and entitled to consideration, and that we are in error in the view that they should be disregarded and judgment rendered in favor of plaintiff on the answers of the jury to the series of issues Nos. 3, 5, 7, and 8, then we think a mistrial should have been declared because of the irreconcilable conflict between answers of the jury to these two groups of issues. If it can be reasonably said that the answers of the jury to issues Nos. 2, 4, and 6 defeated plaintiff's alleged cause of action, as evidently was held by the trial court, we think it can also be said, with greater reason, that their answers to issues Nos. 3, 5, 7, and 8 established her contention and entitled her to the relief sought. A verdict made up of findings, both establishing and defeating a cause of action, necessarily contains irreconcilable and incongruous elements, and obviously such a verdict cannot be made the basis of judgment. Traders', etc., Co. v. Emmert (Tex.Civ.App.) 76 S.W.(2d) 208, 215.

■ Thus, we are brought to the question regarding the interests of the parties, respectively, in the properties involved. Plaintiff (appellant) contends that, whether tested by the laws of Oklahoma or Texas, she is entitled to one-half of these properties; on the other hand, defendant (appellee) contends that, "* * * all of the leases were bought by appellee, C. M. Joiner, three years prior to his coming to Texas. The payments both of the original price for leases and for the renewals were from his separate estate. There is no community law in Oklahoma. So, his wife had no interest in these leases when bought and never at any time thereafter acquired any interest therein, unless by operation of law, except as to such interest as may have been transferred to her by contract."

The record discloses that over 20 years prior to August 31, 1933, for business reasons, defendant decided to move his family from Ardmore, where they had resided for many years, to Oklahoma City, but Mrs. Joiner objected, for reasons, among others, that her children and friends resided at Ardmore. However, Mr. Joiner took up his residence at Oklahoma City, and at first, it seems, was very much displeased because of the refusal of Mrs. Joiner to leave Ardmore, and filed suit for divorce, on the ground that, by refusing, she was guilty of abandonment. This suit was dismissed, and thereafter defendant seemed to have acquiesced in the situation. Practically all the time since leaving his family, as stated, defendant has been engaged in business in and out of Oklahoma City, and at several places in Texas. Although not living together as husband and wife, with the intimacy that usually characterizes that relationship, there was no rupture or ill-feeling engendered between them. Defendant's interest in his family did not abate; he gave such assistance toward their support as he was able, and they maintained an irregular association and correspondence. It was during this period that defendant acquired title to about 13,000 acres of oil leases on lands in East Texas, in 1927 begun their development, and, in October, 1930, succeeded in bringing in what is now called the Joiner Oil Field. At the institution of this suit, his wealth was estimated to be about $1,000,000, consisting chiefly of oil runs that represented the unpaid purchase money for leases sold, stock in several oil companies, in a mining corporation, residence property in Dallas and Ardmore, and 445,000 acres

in the state of Durango, Republic of Mexico.

The question presented is: What, if any, interest does Mrs. Joiner own in these properties? The statute of Oklahoma, section 4969, Rev. Laws 1910, provides for the disposition of the separate property of the spouses where a divorce is granted; also provides for the disposition of property acquired by the parties jointly during their marriage in the following language: "As to such property, whether real or personal, as shall have been acquired by the parties jointly during their marriage, whether the title thereto be in either or both of said parties, the court shall make such division between the parties respectively as may appear just and reasonable, by a division of the property in kind, or by setting the same apart to one of the parties, and requiring the other thereof to pay such sum as may. be just and proper to effect a fair and just division thereof."

The Supreme Court of Oklahoma, in Thompson v. Thompson, 70 Okl. 207, 173 P. 1037, 1038, likened this class of property to that of community property of the community property states, saying that: "The statute regards the property of married persons as falling into two classes—the separate property of each of the spouses and the property which has accumulated by the business side of the marriage. This latter character of property, very similar in conception to the community property of the community property states, is regarded as being held by a species of common ownership. This is shown by the statute itself, where it speaks of the property 'acquired by the parties jointly during marriage, whether the title be in either or both of said parties.' No one will question the power and duty of the court in dissolving the marriage relation to divide the common property, and the above-quoted statute allows the court to go beyond this and give to either party under certain circumstances a portion of the separate property of the other." To the same effect, see Tobin v. Tobin, 89 Okl. 12, 213 P. 884.

If, as stated in Thompson v. Thompson, supra, property acquired during the marriage "is regarded as being held by a species of common ownership," very similar in conception to the community property of community property states, to be equitably divided when the spouses are divorced, the question is: What are the factors justifying an unequal division? The Supreme Court of Oklahoma holds, in effect, that the division of such properties should be equal, as under the community property laws of the community property states, such as Texas, unless an unequal division is justified on equitable grounds, or by reason of the fault of one of the spouses. The parties seemed to be in accord on this proposition. Counsel for plaintiff (appellant) at page 13 of the brief, say: "So it is seen that whether tested by the laws of Texas or the laws of Oklahoma, all the property that the parties owned on August 31, 1933, was in fact owned jointly and to be divided equally unless one of the parties was at fault." A similar statement of the rule is made by counsel for defendant (appellee) at page 31 of the brief, as follows: " * * * the correct proposition being that, under the laws of Oklahoma, when property has been accumulated by the joint efforts of the husband and wife, a court of equity, in dividing the property, when the parties are divorced, may award less than half of such property to the husband or wife guilty of any 'misconduct." The question, therefore, is: Does the record disclose an equity in favor of the defendant, or a fault on the part of plaintiff justifying an unequal division of these properties? We do not think so. On August 31, 1933, during their last recorded interview, defendant said to his wife: "You are a fine woman and a fine mother, and I respect you and admire you for it, but we have never been congenial, we are not compatible, that is we look at life differently, and it will be impossible for us to live happily together."

So, on the authority of Mr. Joiner himself, the head and front of his wife's offending was that she possessed a disposition or nature incompatible with his own. Although this was rather a belated discovery, yet if incompatibility existed, it was no more the fault of one than it was of the other, in truth, was not a fault at all, but an unfortunate condition. The record, in our opinion, fails to disclose the existence either of an equity in favor of defendant or a fault on the part of plaintiff, that would justify a court in depriving her of an equal division of these properties.

■ The East Texas oil leases were purchased with funds jointly acquired in Oklahoma during the marriage of the parties, and at the time of these investments was held, as said by the Supreme Court of Oklahoma, "by a species of common ownership, * * * similar in conception to the community property of the community property states." Hence, it follows that, under the doctrine announced in McDaniel v. Harley (Tex.Civ.App.) 42 S.W. 323; Thayer v. Clarke (Tex.Civ. App.) 77 S.W. 1050, affirmed by the Supreme Court, 98 Tex. 142, 81 S.W. 1274, all properties so acquired in Texas were jointly owned by the parties.

Defendant contends, however, that the funds invested in these oil leases and the wealth resulting therefrom, belong to defendant in his separate right, and that plaintiff has no interest whatever therein. This contention is set forth at length at pages 67 and 68 of appellee's brief, as follows: "Mr. Joiner further testified that in 1907 and 1909, he went up to Oklahoma City to try to retrieve his financial situation; that he moved to Oklahoma City but that Mrs. L. A. Joiner would not go; that she did not want to go; that she would not move away from Ardmore where her children were. That all the children were married except one; that he had two boys and five girls; that both the boys were married and four of the girls were married, and at that time none of them had left Ardmore. He said Mrs. L. A. Joiner gave as her reason for not wanting to leave Ardmore and go to Oklahoma City that her friends were in Ardmore and her children were there and she would not leave them; that he established an office in Oklahoma City and after she refused to move to Oklahoma City he filed suit for divorce, on the grounds of desertion because 'she would not move from Ardmore to Oklahoma City; that this suit was filed in Oklahoma City but was dismissed. That he did not have any money at all when he went from Ardmore to Oklahoma City, but did make some money in Oklahoma City, and there bought the leases, the so-called East Texas leases; that Mrs. Joiner did not put any money into those leases and did not contribute anything whatsoever towards the purchase of those leases. That from the time he went to Oklahoma City, and especially from the time that he filed his suit for divorce up to August 31, 1933, he never at any time lived with Mrs. Joiner as husband and wife; never did cohabit with her at all from that time on; that she never did anything whatsoever towards assisting him in making the money with which he purchased the East Texas leases."

Reduced to its simplest form, defendant's contention is that, because plaintiff, under the circumstances, refused to move from Ardmore to Oklahoma City, she forfeited all right to share these subsequent acquisitions. Just what her duty was at that time, that is, whether to move or remain, as she did, we express no opinion; however, it appears that, although at first displeased, defendant acquiesced in the situation. While it is true that defendant did not thereafter regularly reside with the family or live with plaintiff in the intimacy of married life, yet they maintained an irregular correspondence, association, and a cordial relationship. Greeting his wife on the occasion of his visit, on August 30, 1933, defendant addressed her, "My dear," embraced and kissed her. By voluntarily absenting himself from their home, defendant deprived himself of the wifely ministries that otherwise plaintiff would have bestowed upon him; that she was a good wife and good mother was attested by defendant. So, in its last analysis, which of these spouses performed the greater service to the family and to society, the wife who maintained a home and haven for children and grandchildren, where in sorrow and misfortune she could mother them even "as a hen gathereth her chickens under her wings," or the husband and father who out in the open, battled conditions, overcame difficulties and amassed a material fortune? Each, we think, in his and her appropriate sphere of activity and service, performed well.

So, in harmony with these views, the judgment of the court below is reversed, and judgment is here rendered for Mrs. L. A. Joiner against C. M. Joiner, canceling the instrument dated August 31, 1933, and for the recovery of an undivided half of all and singular the effects, real and personal, possessed by plaintiff and defendant, on September 7, 1933, the date of the alleged divorce, the same being properties jointly acquired by the parties, during marriage, wherever said properties may be situated, and in whatever form the investment may now exist, if changes have taken place since the above date, and the case is remanded to the trial

court to effectuate a fair and equal partition of said properties, and to that end, by appropriate supplemental pleadings and proof, the parties may show, and the court ascertain the properties to be partitioned and of what they consist, as authorized by title 104, arts. 6082, to and including 6109, R. C. S. 1925; however, the rights of defendants Hunt Production Company, H. L. Hunt, and Walter Gant, should be recognized and respected, nothing to the contrary being shown, as set forth in their answers, respectively.

## On Rehearing.

Defendant contends that, in reversing the judgment of the trial court and rendering judgment in favor of plaintiff for one-half of the properties acquired during the marriage of plaintiff and defendant, we deprived defendant of his property without due process of law, and denied to him a trial by jury, contrary to both State and Federal Constitutions (Const. Tex. art. 1, §§ 15, 19; Const. U. S. Amends. 7, 14).

We think it obvious that our decision was not predicated on any fact or group of facts taken from the jury and decided by us; but, on the contrary, was predicated on findings of the jury that, in our opinion, imperatively required the rendition of such judgment.

It is contended that we erred in considering plaintiff's assignment of error No. 4, complaining of the action of the court in refusing to grant her motion for judgment non obstante veredicto, because the assignment was not briefed. We neither discussed nor considered this assignment; but in disposing of the various objections urged by defendant to the consideration of plaintiff's assignments and propositions, we held that the questions discussed had been properly presented, and in this connection, among other things, said that "In truth, assignment No. 4, to the effect that the court erred in refusing plaintiff's motion for judgment non obstante veredicto and assignment No. 5, to the effect that the court erred in refusing plaintiff's motion for judgment on the verdict, present fundamental error." We were partially in error in the above statement, as it is obvious that assignment No. 4 was not well taken and did not present fundamental error, or error at all, in that, under the statute (Vernon's Ann.Civ. St. art. 2211), a judgment non obstante veredicto is not authorized unless a directed verdict would have been proper, and as the evidence was conflicting on the pivotal issue, the court did not err in refusing the plaintiff's motion for judgment non obstante veredicto. However, this is a negligible matter, and the opinion will be corrected by deleting all references to assignment No. 4 as presenting fundamental error.

As shown in the original opinion, we construe special issues Nos. 2, 4, and 6 as referring to statements and representations by defendant to plaintiff made after the instrument of August 31, 1933, was prepared, and because the evidence failed to disclose that defendant made any representations in regard to the matter after the preparation of the instrument, we held that the findings, in answer to said issues, could not have been otherwise; and, further that said findings, in view of the undisputed evidence did not conflict with the findings to issues Nos. 3, 5, 7, and 8, that we held entitled plaintiff to judgment. In view of these holdings counsel for defendant have this to say: "We do not know where the court gets its authority to state that the meaning of the question is whether the defendant, 'after the preparation of the instrument, represented to the plaintiff, etc.'" We got our authority for the meaning attributed, from the pleadings that framed the issues, to which the charge was referable; from the unambiguous language in which these issues were phrased, and from the answers of the jury thereto. Issue No. 2 reads as follows: "Do you find from a preponderance of the evidence that the defendant, on the occasion of writing the contract dated August 31, 1933, represented to the plaintiff that it was a joint will providing, etc.?" The word "it," used in the charge, referred to the instrument, and, of course, there was no "it," i. e., instrument, until written. This conclusion we think inescapable. Issue No. 4 submitted the identical issue, and has the same meaning; and the answer of the jury to issue No. 6, that plaintiff, in signing the instrument, did not rely solely on representations of defendant, is a necessary corollary, for if, after the instrument was prepared, no representation was made by defendant to plaintiff, it cannot be said that, in signing the instrument, plaintiff relied either solely, or in any sense, upon representations, the evidence discloses and the jury found, were not made.

So much for the interpretation we gave to these issues. Counsel, however, made the following additional observation in regard to the matter: . They say, "This court has interpreted the language to mean something, which neither the trial court nor the lawyers on either side nor any juryman misunderstood. The argument before the jury, the argument before the trial court and the argument in the Court of Civil Appeals did not anywhere suggest the finding by the Court of Civil Appeals that Special Issue No. 2 in any way, even remotely, referred to anything whatsoever that happened after the preparation of the contract." In making this criticism, counsel for defendant evidently have forgotten the oral argument of counsel for plaintiff, when the cause was submitted, and also have overlooked pertinent language contained in plaintiff's brief. On this point, the brief states that, "While plaintiff alleged that when defendant came he asked her to join with him in such joint will and told her he was going to write such will and that she believed it was a joint will she was signing, the petition also alleged that after it was written he reiterated such statements. In her testimony, however, she testified to all the facts preceding the writing of the instrument as alleged but said that she had faith in him and went ahead and signed it after it was written, and that nothing was said after it was written. However, the court submitted both theories, though there was no evidence on the second. By Questions Nos. 1, 3, 5 and 7, he submitted the issues as to the statements made prior to the writing of the instrument, Question No. 1 being as to whether he requested her to join in such will; Question No. 3 being as to whether she agreed with him to execute a joint will; Question No. 5 being as to whether she believed it was a joint will when she signed it, and Question No. 7 being as to whether she would have signed it if she had known it was not a joint will. Questions Nos. 2, 4 and 6 were with reference to the second theory alleged as to his statements after he had written the instrument."

The above, we think, is sufficient to acquit this court of the imputation of having invented an interpretation or given a meaning to the issues not insisted upon or presented by counsel for plaintiff.

Counsel insist that we erred in holding that plaintiff was entitled to judgment on the answers to issues Nos. 3, 5, 7, and 8, and in this connection say, "In the first place, the Court of Civil Appeals misquotes the finding of the jury in answer to Special Issue No. 3. The court says, 'As to issue No. 3, the jury found that, on the occasion in question, plaintiff and defendant entered into an agreement to execute a joint will, containing the provisions substantially as set out in Special Issue No. 2, etc.' The exact language of Special Issue No. 3 is, 'Do you find from a preponderance of the evidence that on August 31, 1933, plaintiff, Mrs. L. A. Joiner, agreed with the defendant, C. M. Joiner, to join with him in the execution of a joint will containing the provisions substantially as set out in Special Issue No. 2?'"

We did not pretend to quote the matter mentioned, hence did not misquote anything, but simply interpreted the special issue as answered by the jury, and the meaning thus stated by us is precisely the same as if the matter had been stated as counsel insists it should have been, and counsel do not contend to the contrary, hence this criticism is pointless.

It is further said that, "The Court of Civil Appeals erred in its finding that the 'jury did convict defendant of want of candor and bad faith, in securing the signature of his wife to the instrument, the effect of which was to find him guilty of fraud.'" With reference to this, counsel say: "Where is there any justification for this statement? The word 'candor' does not appear anywhere in the case, except in the opinion, nor is the word 'bad faith' in this case other than in the opinion of the court, and in addition to this, it is the first time that we have seen in an opinion of any court that a want of candor had anything whatsoever to do with the finding of fraud. Many people are lacking in candor, who are not guilty of fraud. As far as bad faith is concerned, there is no finding of the jury that convicts the defendant of bad faith. Bad faith is another word for fraud. Bad faith was not submitted to the jury. Bad faith does not appear either in the pleadings, the evidence or the findings of the jury. Bad faith is merely a conclusion that the court puts upon the findings of the jury in answer to questions 3, 5, and 7."

As stated in the original opinion, the material question involved was, whether or not the action of defendant in obtaining

the signature of plaintiff to the instrument of August 31, 1933, was fraudulent. We think the conclusion inescapable that the findings of the jury, considered in connection with the evidence upon which they were predicated, show that defendant was lacking in candor and guilty of bad faith, tantamount to a finding that defendant was guilty of fraud in obtaining the signature of his wife to the instrument in question. "Candor" means to treat a subject with fairness, impartiality, and to be outspoken, frank, veracious, and is synonymous with other terms describing morality. The terms "bad faith" and "fraud" are synonymous, and also synonyms of dishonesty, infidelity, faithlessness, perfidy, unfairness, etc. The jury found that, on the occasion in question plaintiff and defendant entered into an agreement to execute a joint will. Admittedly, the instrument prepared by defendant, to which he secured his wife's signature, bore absolutely no resemblance to a will. The jury also found that when plaintiff signed the instrument she believed it to be the joint will of herself and defendant, and would have refused to sign had she known it was not their joint will. Her testimony was to the effect that she trusted defendant, and without any questioning signed the instrument after he finished its preparation, believing it to be their joint will, and that, after its preparation, defendant neither read or explained it to her. In this situation, the implication is irresistible that the jury findings convicted defendant of want of candor and of bad faith in securing the signature of his wife to the instrument, in effect finding him guilty of fraud.

In addition, we think defendant was uncandid in concealing from plaintiff a matter of considerable materiality to her. Defendant testified that he and Miss England had been engaged to marry for at least a year prior to August 31, 1933, their marriage to be consummated when plaintiff obtained a property settlement with and a divorce from his wife. He went to Ardmore on this occasion for no purpose other than to obtain this property settlement, and after securing his wife's signature to the instrument, bade her goodbye, intending that that should be the last time he and she would meet as man and wife, but defendant failed utterly to disclose to his wife anything in regard to his intention to divorce her and marry Miss England. The jury found, in answer to issue No. 8, that plaintiff would have refused to sign the instrument if defendant had told her of his intention to marry Miss England. It is evident that Mrs. Joiner was chiefly interested in the future welfare of her children; therefore her willingness to agree to a joint will in their interest is perfectly reasonable, but we think it unreasonable to assume that she would have executed any instrument in furtherance of the designs of Mr. Joiner to obtain a divorce and marry the young woman, thus introducing a stranger to assert the rights of a wife in his share of the property. Fraud may be committed negatively as well as positively, for whether committed one way or the other, the same result may be produced.

We think it was the duty of defendant to have made a full disclosure to this trustful wife of fifty-two years' standing of his intention to divorce her and marry the other woman. The relationship of husband and wife is not an ordinary relationship, but is one of greatest confidence and intimacy. The lawbooks characterize a concealment of this kind as tantamount to active fraud. 12 R.C.L. p. 305, § 66, announces the following doctrine: "Fraud may be committed by the suppression of the truth as well as by the suggestion of falsehood, and it is equally competent for the court to relieve against it whether it is committed in one way or the other. The one acts negatively, the other positively; both are calculated, in different ways, to produce the same result. The former as well as the latter is a violation of the principles of good faith. It proceeds from the same motives and is attended with the same consequences; and the deception and injury may be as great in the one case as in the other. * * *"

Counsel say, "The Court of Civil Appeals erred in holding that the East Texas oil leases were purchased with funds jointly acquired in Oklahoma during the marriage of the parties," and then make the charge, "that there is absolutely not one word of testimony in the entire record that justified this finding of fact. * * *" This criticism is made in the face of undisputed evidence, none to the contrary, that the consideration paid by Mr. Joiner for the oil leases in East Texas were from funds acquired in Oklahoma during the marriage of the parties, hence under the statute of that state, as said by the Supreme

Court of that state, were held by "a species of joint ownership," and this, we think, would be true whether the funds were acquired as the result of the labor and efforts of one or the other. We do not think the laws either of Oklahoma or Texas would require a wife to hew wood, draw water, grub, plow, sow, reap, tend herds, trade, buy, sell, sink oil wells, etc., to be entitled to share in the accumulation from these sources. Her marital duties are discharged in other and different spheres, appropriate to wifehood and motherhood, as recognized the country over.

Again counsel say, "The court is not justified in stating that 'while it is true that defendant did not thereafter regularly reside with the family or live with plaintiff in the intimacy of married life, yet they maintained an irregular correspondence, association and a cordial relationship.'" With reference to this, counsel say: "What the record actually showed * * * was that after the wife had abandoned her husband there had never been any relationship between them, not even in the form of a correspondence."

The undisputed evidence, we think, forbids the conclusion that Mrs. Joiner had "abandoned her husband," as repeatedly stated by counsel in the argument. Mr. Joiner did not so regard the matter, for after dismissing the suit filed by him in Oklahoma City many years before, he continued as before to make Ardmore his home, and continued the recognition of his marital relationship down to August 31, 1933. In parting with Mrs. Joiner and his daughter on that occasion, Mr. Joiner testified that they kissed each other and shed tears, but stated in this connection that it was his intention, not disclosed to his wife, that he and she would never meet again as husband and wife. In urging the criticism last quoted, counsel for defendant either ignored or overlooked their own allegations and proof. In order to combat the contention of plaintiff, that their domicile had been changed from Oklahoma to Texas, and to invoke the laws of Oklahoma, defendant, in his second original answer, alleged: "That the said defendant and the plaintiff were married, as alleged by the plaintiff, on January 16, 1880, and lived together as husband and wife in the State of Oklahoma until August 31, 1933. * * * Defendant represents that plaintiff and this defendant never at any time lived in the State of Texas, or had their home or domicile in the State of Texas. * * * Defendant represents to the court that while he was still living in the State of Oklahoma, and before coming to the State of Texas he purchased several thousand acres of leases on what is now known as the East Texas oil field, etc.; * * * that he never at any time designated a place of residence and domicile for plaintiff and defendant at Dallas, Texas, or any other place in Texas, and never attempted to make any such designation after the plaintiff failed and refused to change her place of residence from Ardmore, Oklahoma to Oklahoma City, as above alleged, and that knowing plaintiff's set determination not to move from Ardmore, Oklahoma, the defendant never at any time suggested to the plaintiff that she remove her residence and domicile from Ardmore to Dallas, or any other town or city of Texas, and that in truth and fact the domicile of plaintiff and defendant during all of the time from 1923 to 1933, up to the date of the settlement above mentioned, the residence home and domicile of plaintiff and defendant continued to be and was in Ardmore, Carter County, Oklahoma, and remained the same up to and including the 31st day of August, A. D. 1933.". At another place in his answer, after alleging plaintiff's refusal to move from Ardmore to Oklahoma City, defendant alleged that "from said time up to the time of the execution of the contract hereinabove set out (contract of August 31, 1933), plaintiff and defendant never at any time lived together or co-habited as man and wife, but defendant in order to try to keep peace in the family continued to support the plaintiff in her residence at Ardmore, Oklahoma, and for all practical purposes continued to maintain his residence and domicile of their marriage in the State of Oklahoma, and in the city of Ardmore; and that on the 27th day of December, 1930, defendant purchased the home place known as number 601 North Washington Street, in the City of Ardmore, Carter County, Oklahoma, and furnished the same, and plaintiff never at any time after the purchase of said home desired to be elsewhere except in said home, and defendant never at any time desired the plaintiff thereafter to be at any other place except in said home, and said home place was considered by both the plaintiff and defendant, and by all members of the family, as the residence, home, domicile and place where the plaintiff and defend-

ant had their residence and home, and neither plaintiff nor defendant ever at any time thereafter up to the date of the making of said contract, ever discussed or intended any other house, place, residence or room to be their home. * * *"

The testimony of the defendant is equally, if not more, explicit; he testified, in effect, that he considered Ardmore his home from 1897 to the date of the contract, August 31, 1933; that he had the same telephone number for thirty years and was listed in the city directory of Ardmore. As touching his intimate family relationship, writing to Mrs. Joiner in 1932, addressed her "Dear Lydia," and in the discussion of business matters said: Neither you nor I ever let money disturb our love, and I am not going to let you worry if I can help it. I am going to see you real soon, and any demands or suggestions to lift you out of work, will do it." Further, he stated, "I hope you will no longer worry, but rest assured, you will be taken care of if anything is saved." He testified that Mrs. Joiner rarely ever wrote to him, except when some of the children were sick, but that she was not given to much writing; referred to the home at Ardmore as "our home in Ardmore"; on an occasion when Mrs. Joiner was sick defendant wrote that he would call up every night; that during a spell of sickness at home, his wife was very kind, waited upon him attentively; that he had a room in the house that he occupied when in Ardmore; that Mrs. Joiner was very much beloved in Ardmore; that during their long married life, so far as he could remember, neither ever said an unkind word to the other, and paid her this extraordinary tribute, "There never was and never will be a better woman," and that under no circumstances would he say a harsh word against her. It furthermore appears that in 1932, she gave him a power of attorney to act for her in making a separate community income tax report. This relationship continued down to the moment they parted at Ardmore on August 31, 1933.

So, we conclude that defendant's admissions in pleadings and testimony fully justified the statement, in the opinion of this court, to the effect that, while defendant did not thereafter (after the refusal of Mrs. Joiner to move to Oklahoma City) regularly reside with the family, or live with the plaintiff in the intimacy of married life, yet they maintained an irregular correspondence, association, and a cordial relationship.

In the course of the discussion, in the original and in this opinion, we deemed it our duty to write plainly as to the legal effect of the conduct of Mr. Joiner, in concealing from Mrs. Joiner his intention to divorce her and marry again, and, as found by the jury, after agreeing to the execution of a joint will, in preparing and having her execute the instrument in evidence. However, we wish to say in behalf of Mr. Joiner that the facts showed that prior to August 31, 1933, he was kind, considerate, and solicitous for his wife and children, and that, after bringing in the oil field and becoming wealthy, he purchased for his wife a splendid home in Ardmore, and furnished it expensively, was liberal with all the children, giving to each a monthly allowance from oil runs, and provided handsomely for the support of Mrs. Joiner and their unmarried daughter, Fannie. But Mr. Joiner and his stenographer, being engaged to marry, the marriage to be consummated when he obtained a property settlement with and divorce from his wife, his only mission to Ardmore on the occasion was, to remove the first impediment, i. e., to secure such property settlement. He evidently knew that if Mrs. Joiner was informed of his intention to divorce her and marry again, she would refuse to sign any document, whether the one he said was executed or the one she testified that she thought she was signing. So he concealed from Mrs. Joiner his plans, which, in our opinion, furnished sufficient grounds for the cancellation of any document obtained under the circumstances, whether the one defendant said was executed, or the one plaintiff said she thought she was signing, for, in either case, good faith required a full disclosure.

We have written at unusual length, but feel justified in so doing, in view of the criticisms in the motion for rehearing that go deeper than the mere questioning of the correctness of our conclusions. Whether or not intended, as the strong language imports, the court is charged with misquoting the record and announcing conclusions without one word of testimony in the entire record justifying such conclusion. In our opinion, it would be absolutely indefensible for an appellate court, in order to bolster a position taken, to misquote the record, or announce conclusions

without supporting evidence. We are not open. to these criticisms, hence in order to bare our reasons for the position taken, we have gone into the record rather extensively.

All grounds urged for a rehearing have been duly considered, and finding no reason to change our original decision, the motion is overruled.

Overruled.