*Decision will be entered under Rule 50.*

MAMIE S. HAMMONDS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FRED P. BRANSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 78210, 78211, 85896. Promulgated July 12, 1938.

*Charles H. Garnett, Esq.,* and *Fred P. Branson, Esq.,* for the petitioners.

*W. R. Lansford, Esq.,* for the respondent.

8

OPINION.

BLACK: In these proceedings the amounts of the cash payments received by petitioners in the sale of the Texas oil leases are not disputed. The amounts received by petitioners Hammonds and Branson from in-oil payments in 1932 and the amount received by petitioner Branson in 1933 are likewise not disputed.

The questions which are at issue are as to whether the amounts received by petitioner Hammonds as her part of the proceeds from the sale of the leases were her separate property and therefore her separate income, or represented the community property of petitioner Hammonds and her husband, O. O. Hammonds, and therefore their community income, taxable one-half to each on their separate returns, which were duly filed. Other issues concern the question of proper depletion allowances and one or two other issues of a more or less minor nature, which will be stated separately later.

The first question which we shall consider is whether the income of petitioner Hammonds from the sale of oil and gas leases, entered into and consummated within the State of Texas, is community income of herself and husband under the community property laws of Texas, taxable one-half to her and one-half to him, notwithstanding they were residents of and domiciled in the State of Oklahoma at the time.

In order to have a proper discussion of the point which we have here to decide, we must first determine whether the oil leases which were acquired by petitioner Hammonds in Texas in 1930 were personal property or represented an interest in real estate. If the oil leases were personal property, then the decision is not difficult because there can be no question that, where either of the spouses who are domiciled in a noncommunity property state acquire personal property during coverture, the law of the domicile governs and not the law of the situs of the property. McKay on Community Property, sec. 641.

In this proceeding both parties agree that the domicile of petitioner Hammonds was in the State of Oklahoma and that if the oil

leases acquired in Texas are properly classed as personal property the laws of Oklahoma control and the property would belong to the separate estate of petitioner Hammonds. However, it seems perfectly clear that under the laws of Texas the oil leases acquired in that state were not personal property, but represented an interest in realty. *Stephens* v. *Stephens*, 292 S. W. 290; *John O'Neil*, 16 B. T. A. 614. So we are led to inquire what law governs when one of the spouses domiciled in a state where the community property law does not prevail acquires real property in a community property state. The status of land and of the income from the sale thereof involves a rule of property in respect of which we are bound by the law of the state where the land is situated. *Rosalie Hampton*, 31 B. T. A. 853, and cases there cited. That much being decided we inquire, What is the rule of law in Texas applicable to real estate located there which has been acquired by one of the spouses where the husband and wife are domiciled in another state in which community property laws do not prevail? Looking to the Texas law we find that article 4619, sec. 1, vol. 13, Vernon's Annotated Texas Statutes, reads:

All property acquired by either the husband or wife during marriage, except that which is the separate property of either, shall be deemed the common property of the husband and wife and * * * all the effects which the husband and wife possess at the time the marriage may be dissolved shall be regarded as common effects or gains, unless the contrary be satisfactorily proved.

It seems rather clear that under the Texas decisions, the foregoing presumption applies to real estate acquired by nonresidents as well as residents. See *Thayer* v. *Clarke*, 77 S. W. 1050.

But this presumption which applies in favor of the community status of the real estate thus acquired is rebuttable both as to real estate acquired by residents of Texas and that acquired by nonresidents. The Court of Civil Appeals, in *Thayer* v. *Clarke*, *supra*, states what appears to be the rule in Texas, in the following language:

We state briefly what in our opinion is the law upon the point: It is well settled that as to all personal property acquired during coverture the law of the matrimonial domicile controls, such property having in theory no fixed situs. As to all real estate so acquired the law of the state in which it is situated controls, so that in conveying or incumbering it, wherever the transaction may occur the evidence of the sale or incumbrance must be executed according to the requirements of the law of the state of its situs. * * * So if the husband buy real estate with his separate money, the real estate is his, wherever located. *The presumption growing out of the fact of its acquisition during marriage, affects only the burden of proof and is a mere detail which becomes immaterial when the facts are established.* [Italics ours.]

And the court went on to hold in that case that, it having been proved that the funds with which the real estate in Texas had been

acquired were the separate property of the husband, the real estate so acquired was his separate property. This decision of the Court of Civil Appeals in *Thayer* v. *Clarke* was affirmed in a per curiam opinion of the Supreme Court of Texas, reported at 81 S. W. 1274. Petitioner Hammonds concedes the force of this opinion against her if the oil leases in question had been purchased with her separate funds, but she contends that the leases were acquired as compensation for her individual efforts and services and that no money was paid for them. She contends further that under the laws of the State of Texas compensation earned by the wife for her services in Texas is the community property of herself and husband, and therefore the oil leases are community property. That would undoubtedly be true if the parties were domiciled in Texas, but they were not. It is true that, without proof of anything but that the leases were acquired during coverture, the presumption that the property is community property would prevail. For example, if petitioner Hammonds had died while she was the owner of an interest in these oil leases, and her husband had brought suit in the Texas courts for a community interest in the leases and in support of his claim had proved that the leases were acquired during coverture and had stopped there, and Mrs. Hammonds' heirs had offered no proof in opposition and had not proved that the leases were acquired by Mrs. Hammonds' own individual efforts and industry while she was domiciled in Oklahoma, we think that in all probability under such circumstances the community property presumption of the Texas statutes would prevail, and the leases would be held to have been community property of petitioner Hammonds and her husband. But, as was said in *Thayer* v. *Clarke*, *supra:* "The presumption growing out of the fact of acquisition during marriage, affects only the burden of proof and is a mere detail which becomes immaterial when the facts are established." In the instant case the facts have been established. As we have already pointed out, it has been established that petitioner Hammonds was domiciled in the State of Oklahoma, and the oil leases were acquired by her own separate efforts and industry. They were not acquired with joint funds belonging to petitioner and her husband. Under these circumstances, we think the oil leases were her separate property.

One of the cases strongly relied upon by petitioner Hammonds in support of her contention that the leases were community property was the case of *Joiner* v. *Joiner*, 87 S. W. (2d) 903, decided by the Court of Civil Appeals of Texas. In that case the wife after divorce from her husband sued him in the courts of Texas for a one-half interest in a large amount of property, including oil leases, situated in Texas, which had been acquired during coverture. It was con-

ceded that the domicile of the husband and wife was in the State of Oklahoma when the property in question was acquired. The lower court held against Mrs. Joiner and denied her any recovery. The Court of Civil Appeals of Texas reversed the lower court and held that Mrs. Joiner owned a one-half interest in the property. The court in its opinion likened property owned jointly by husband and wife in Oklahoma to community property owned by husband and wife in Texas. Undoubtedly this decision did lend some support to petitioner's contention in the instant case, but, since the filing of briefs herein, the *Joiner* case has been reversed by the Supreme Court of Texas. See *Joiner* v. *Joiner*, 112 S. W. (2d) 1049, decided by the Supreme Court of Texas, February 2, 1938.

In its opinion the Supreme Court of Texas held that under the laws of Oklahoma there were two recognized classes of property owned by husband and wife—(1) that which was jointly acquired; and (2) that which was separately acquired. In discussing "jointly" acquired property the court said: "In several cases the Supreme Court of Oklahoma has defined 'jointly' acquired property within the meaning of section 672, 12 Okl. St. Ann. par. 1278, as property 'accumulated by the *joint industry* of the husband and wife during marriage'. See *Tobin* v. *Tobin*, 89 Okl. 12, 213 Pac. 884, 888 and *Bruce* v. *Bruce*, 141 Okl. 160, 285 Pac. 30."

In discussing "separately" acquired property, the court said: "The statutes of that state [Oklahoma] do not specifically define separate property but the decisions, in light of the definitions of 'jointly acquired' property, have by necessary implication defined separate property as property acquired by either spouse as result of his or her separate earnings, skill, industry or labor."

The court then held that the property in Texas, including real estate situated there, had been acquired during coverture by the separate industry and efforts of the husband, C. M. Joiner, and had been acquired while the parties were domiciled in Oklahoma, and under the laws of Oklahoma the property was the separate property of the husband and retained the same character in Texas, and that the wife was not entitled to recover any of it. The court concluded its opinion with this language:

Under the decisions of the Supreme Court of Oklahoma, above mentioned, we have no hesitancy in expressing the conclusion that none of the properties in which plaintiff in this suit claims an interest were "jointly acquired" within the purview of the Oklahoma laws. This being true, the controversy with reference to the settlement agreement becomes of no consequence, as plaintiff had no interest whatever in said properties.

We think the same logic requires us to hold that the interest in the oil leases acquired by petitioner Hammonds by her own efforts and industry were under the laws of the State of Oklahoma her own

separate property and that the rule followed by the Supreme Court of Texas in the *Joiner* case and other cases is to recognize and apply the Oklahoma law in such a situation, even as to real estate located in Texas. This being so, we hold that respondent did not err in treating the income from the sale of the Texas leases as the separate income of petitioner Hammonds and not the community income of herself and her husband. On this point we sustain the Commissioner.

We shall next consider other issues which have been raised by the pleadings.

Two questions involving identical considerations may be disposed of together—(1) whether the petitioners are entitled to a depletion deduction of 27½ percent of $139,800, cash received by them upon the sale of their leases in 1931, each being entitled to one-half thereof, and (2) whether they are entitled to depletion of 27½ percent of $34,785, received by them in 1932 from the Faith Oil Corporation as a part of the original consideration paid by checks of that company which were bad and as a credit on notes given to replace those checks. The petitioners concede that these issues are governed by decisions in *William Fleming*, 31 B. T. A. 623; *Roy H. Laird*, 35 B. T. A. 75; and *Commissioner* v. *Fleming*, 82 Fed. (2d) 324. Arguments advanced by the petitioners are merely by way of repetition of what has already been carefully considered in those cases, particularly respecting the distinction between those and *Palmer* v. *Bender*, 287 U. S. 551, which, needless to say, we have carefully considered and find no reason to recede. It is clear from the facts in our findings that petitioners made an outright sale of the leases for a cash consideration and a further consideration to be paid out of oil if and when produced. Under the foregoing decisions petitioners are not entitled to depletion of the cash consideration and are entitled to depletion of the in-oil payments.

The respondent now concedes two of the petitioners' contentions— (1) that they are entitled to a depletion deduction of 27½ percent of $51,111.02 received by them in 1932 on account of in-oil payments from leases sold in 1931, each being entitled to one-half thereof, and (2) that petitioner Branson is entitled to deduct depletion of 27½ percent of $34,437.92, received by him in 1933 on account of in-oil payments to be made from leases sold in 1931, on the authority of *Thomas* v. *Perkins*, 301 U. S. 655, and the cases above cited. Effect to these concessions will be given in a computation under Rule 50.

Another contention of the petitioners is that they are entitled to deduct from income, as ordinary and necessary business expenses, the intangible drilling and development costs under a turnkey job contract, of $12,426.66 expended on the well drilled by them in 1932, each being entitled to one-half thereof. The respondent contends that this issue is controlled by our decision in *O-W-R Oil Co.*, 35 B. T. A.

452. This, the petitioners concede, offering argument against the correctness of that decision. Upon consideration of the argument presented we find no reason to recede from our former position. The Commissioner is sustained as to this issue.

Petitioner Branson contends that he is entitled to deduct $2,082.18 as a one-third share of the $6,246.55 cost of drilling a nonproductive well known as the Brandenburg well, alleging that the respondent allowed only $422.84 therefor. It of course requires no citation of authority to support the proposition that respondent's determination in the deficiency notice is presumed to be correct and the burden is on petitioner to show by evidence that respondent has erred. We find no evidence in the record which supports petitioner's contention on this point and therefore sustain the Commissioner's determination for lack of evidence to show that it was error.

Finally, the respondent has affirmatively plead the erroneous allowance of a $1,200 credit for three dependents claimed by petitioner Branson for the calendar year 1932, at the same time asserting a claim for any increase in the deficiency for that year which may result from a correction of this alleged error. The burden to support this affirmative allegation is upon the Commissioner and we do not consider that he has discharged that burden.

The only witness offered by respondent to prove his affirmative allegations was petitioner Branson, himself. The substance of Branson's testimony was that in 1932 he spent much more than the $1,200 claimed as credit for dependents, in support of his brother, who was a Methodist preacher whose health broke down and was unable to work and had no means of support, and in support of his family, including his children and also in support of some nephews and nieces who were orphans. One of the nephews was under 18 years of age and one of Branson's nieces was sick most of 1932 and required a serious operation, the entire cost of which Branson paid. Branson testified that in 1932 he contributed practically the entire support of his brother, his wife, and these nephews and nieces. None of them were legally dependent upon him for support. He testified that an accountant made out his income tax return for 1932 and claimed the credit for three dependents upon information which Branson furnished him at that time, but that he is now unable to identify the names of which three of the relatives above referred to the credit for dependents was claimed. If the respondent had disallowed the deduction for dependents in his determination of the deficiency, the presumption of correctness would exist in his favor and we would hold that Branson's testimony above summarized would not be sufficient to overcome it. But the shoe is on the other foot. The burden of proof is on respondent to sustain his affirmative allegations and we do not think

he has done so. Counsel for respondent seems to think that, because Branson frankly testified that none of the relatives to whom he contributed the chief support in 1932 were legally dependent upon him, that fact is sufficient to deprive him of the right of a credit for dependents. That is not true. The statute giving a credit for the support of dependents does not require that they live in the same household as the taxpayer who contributes the support, nor does it require that those who are supported shall be legally dependent upon the taxpayer. Those are some requirements for a credit as "head of a family"—see section 25 (c) and the Commissioner's regulations thereunder—but not for the allowance of credit for dependents. Section 25 (d) of the 1932 Act, providing for the credit for dependents, is printed in the margin.[1]

The Commissioner's regulation respecting credits for dependents, article 294 of Regulations 77, is also printed in the margin.[2]

For aught we know the three dependents for whom petitioner Branson claimed credit in 1932 were his brother, a Methodist preacher, whose health broke down, leaving him unable to work; Branson's nephew, who was under the age of 18 years; and Branson's niece, who, although more than 18 years of age, was ill most of the year and unable to earn her support because of her illness, all of her expenses being paid by Branson, including hospital and medical bills. Branson was the chief support of all three of these relatives in 1932, and, if they are the three for whom he claimed the credit for dependents, they may come within the classification provided in section 25 (d) and the Commissioner's regulations thereunder. Certainly the nephew who was under 18 years of age would come within that classification. Cf. *Crocker* v. *Helvering*, 91 Fed. (2d) 299. Whether the physical disabilities of petitioner's brother and niece were sufficient to bring them within section 25 (d) and the applicable regulations, we do not decide. Respondent has not proved to the contrary. The burden of proof is on him to establish his affirmative allegations. Because he has not done so we hold against him on this issue.

*Judgment will be entered under Rule 50.*

---

[1] (d) CREDIT FOR DEPENDENTS.—$400 for each person (other than husband or wife) dependent upon and receiving his chief support from the taxpayer if such dependent person is under eighteen years of age or is incapable of self support because mentally or physically defective.

[2] ART. 294. *Credit for dependents.*—A taxpayer, other than a nonresident alien who is not a resident of Canada or Mexico (see section 214), receives a credit of $400 for each person (other than husband or wife), whether related to him or not and whether living with him or not, dependent upon and receiving his chief support from the taxpayer, provided the dependent is either (a) under 18, or (b) incapable of self-support because defective.

The credit is based upon actual financial dependency and not mere legal dependency. It may accrue to a taxpayer who is not the head of a family. But a father whose children receive half or more of their support from a trust fund or other separate source is not entitled to the credit.