2000 SD 23

**In the Matter of the DISCIPLINE OF Charles L. DOROTHY, as an Attorney at Law.**

**No. 20479.**

Supreme Court of South Dakota.

Argued Sept. 15, 1999.

Decided Feb. 9, 2000.

Robert B. Frieberg, Board Counsel, Disciplinary Board of State Bar, Beresford, for Disciplinary Board.

Laurence J. Zastrow, Deputy Board Counsel, Disciplinary Board of State Bar, Pierre, for Disciplinary Board.

Charles L. Dorothy, Sioux Falls, pro se.

GILBERTSON, Justice.

[¶ 1.] This is a disciplinary proceeding against Respondent Charles L. Dorothy (Dorothy), a member of the State Bar of South Dakota.

## FACTS AND PROCEDURE

[¶ 2.] Dorothy graduated from the University of South Dakota School of Law in 1974 and was admitted to the practice of law in this state on May 16, 1974. Dorothy is also admitted to practice in the Federal District Court of South Dakota and the U.S. Eighth Circuit Court of Appeals. He has practiced *pro hac vice* in the Federal District Court of Iowa, and the state courts of Iowa and North Dakota. During his legal career Dorothy has practiced as an employee, sole practitioner, partner and shareholder in a professional corporation. He has also served as an assistant attorney general for the State of South Dakota and as a deputy state's attorney. Dorothy has practiced law in Rapid City and Pierre, South Dakota, and currently practices in Sioux Falls, South Dakota.

### HOOVER COMPLAINT

[¶ 3.] Dorothy was contacted by Thayer Hoover on September 3, 1993, for information on child support guidelines regarding his wife Cindy's four children by a previous marriage to Mike Grages. Dorothy asked for and received a $500 retainer from Hoover to be drawn against at the rate of $100 per hour for services performed. No written fee agreement was ever prepared. Dorothy represented that any amount of the retainer not used would be refunded.

[¶ 4.] Although there was an order in the divorce file granting custody of the four Grages children to Mrs. Hoover, there had been a considerable history of the Grages children living with Grages or the parents of Cindy Hoover. Twenty-three depositions were taken during the course of the Grages–Hoover change of custody, support and grandparent visitation proceedings.

[¶ 5.] In December 1993, Dorothy represented to Cindy the case could cost as much as $10,000. However, as of August 1994, Hoovers had paid $47,300 to Dorothy in legal fees and costs. To partially pay Dorothy's fees, the Hoovers had to borrow $10,000 from a bank and took an $8,000 cash advance on their Visa card. In September of 1994, Hoovers paid Dorothy another $1,500 before a scheduled hearing. In October 1994, Hoovers still owed Dorothy $10,000 to $11,000. Ultimately Dorothy claimed he was entitled to $45,100.35 in attorney's fees and $17,550.37 for costs, for a total of $62,650.72.

[¶ 6.] Circuit Judge Glen Severson heard six days of testimony. Settlement was finally reached in August 1994, by mutual agreement of the parties who agreed to split custody of the children. The amount of child support was also settled by stipu-

lation based upon the statutory child support guidelines.

[¶ 7.] Dorothy brought suit against Hoovers for the over $14,000 of claimed unpaid legal services and costs in connection with the custody proceedings. Judge Tim D. Tucker, granted judgment in favor of the Hoovers. Dorothy did not appeal this ruling. Subsequently, the Hoovers filed an ethical complaint against Dorothy with the State Bar of South Dakota. The Disciplinary Board found Dorothy violated South Dakota Rules of Professional Conduct 1.1, 1.2(e), 1.3, 1.4, 1.5, 1.16, 2.1 and 8.4.

### FLUGGE COMPLAINT

[¶ 8.] In 1992, Richard C. Flugge (Flugge), a certified public accountant in Sioux Falls retained Dorothy to represent him in a legal dispute he had with Steven Wagner, a CPA whose employment Flugge terminated. Dorothy brought a lawsuit on behalf of Flugge in April of 1992 for the recovery of client files taken from Flugge by Wagner in violation of their employment contract. Wagner employed attorney Gale Fischer to defend him in the Flugge matter. On May 24, 1994, Fischer made an offer of judgment as to Flugge's breach of contract claim admitting Wagner had performed business for Flugge's clients, and advising Dorothy he could obtain a judgment based on the offer of judgment. On June 27, 1994, Judge William Srstka entered partial judgment for Flugge in the amount of $703.75 based on the offer of judgment.

[¶ 9.] On August 17, 1994, Fischer wrote a letter to Dorothy, stating Flugge was entitled to recover $455.72 after deduction of costs which had been awarded to Wagner concerning another portion of the litigation. On August 25, 1994, Dorothy received a letter dated August 24, 1994 from Fischer enclosing a trust account check for $455.72 and a satisfaction of judgment to be signed by Dorothy on behalf of Flugge. On January 22, 1997, Flugge called Dorothy regarding the judgment against Wagner for which he had never been paid.

Upon Flugge's request, an associate of Dorothy's commenced execution and garnishment proceedings against Wagner to recover the $455.72. Wagner was subsequently levied upon and the constable delivered a check to Dorothy payable to Flugge and Dorothy. On March 13, 1997, Flugge was informed a check had already been tendered by Wagner. On March 14, 1997, Wagner's attorney filed a motion for modification of judgment asserting he had mailed a trust account check for $455.72 to Dorothy on August 24, 1994. On March 17, 1997, Dorothy advised Flugge he had never received a check from Fischer for $455.72, and discussed possible ethics violations by Fischer and possible Rule 11 sanctions for misconduct. Dorothy prepared an affidavit which denied his receipt of Wagner's trust account check. Flugge also prepared an affidavit denying the receipt of the trust account check.

[¶ 10.] Prior to the hearing on Fischer's motion for modification of judgment, Dorothy discovered the trust account check from Fischer in the amount of $455.72 dated August 24, 1994 in his "appellate file." Dorothy provided Flugge with copies of the trust account check but failed to explain it was in satisfaction of the judgment. As a result, Flugge believed the copies were of Fischer's pleadings, and thus on April 4, 1997 he signed the affidavits and pleadings requesting Rule 11 sanctions against Fischer. Flugge believed the Rule 11 motion was to recover attorney's fees because he thought Fischer's affidavit was false.

[¶ 11.] On April 16, 1997 a hearing on the motions was held. Wagner's attorney represented to the court that either Flugge or Dorothy had received the trust account check. At this time Dorothy revealed to the court he had in fact received the check. The trial court ordered Flugge to return or destroy the trust account check and return the funds obtained by the execution on Wagner's bank account. On April 17, 1997, Flugge sent Dorothy a detailed letter expressing his concerns re-

garding the manner in which Dorothy had represented him involving the trust account check, including the fact Dorothy had withheld information regarding the receipt of such check. Flugge requested Dorothy dismiss the motion for Rule 11 sanctions against Fischer. On April 24, 1997, Dorothy replied by letter "I believe that you saw the letter, check and satisfaction on August 30, 1994."

[¶ 12.] On April 21, 1997, pursuant to the trial court's order, Fischer sent to Dorothy a cashier's check for $455.72 payable to Flugge and Dorothy. Dorothy wrote to Flugge informing him, "I will not immediately endorse Constable Harris' check over to Fischer and Wagner or send or deliver the check to them immediately, but I will endorse it and give it to you to do with it as you deem appropriate." Dorothy then sent the check along with a letter to Flugge on April 28, 1997, stating, "I will endorse it [constable's check] and the cashier's check [$455.72] I sent you last week when our billing dispute is resolved." Dorothy claims he had a possessory attorney's lien on the two checks, although he never attempted to perfect the "attorney's lien" in the required manner. On May 5, 1997, Flugge sent Fischer his personal check for the costs assessed in accordance with the trial court's April 16, 1997 order. Flugge was ultimately able to secure a reissued constable's check payable only to himself.

[¶ 13.] In his April 18, 1997 letter to Flugge, Dorothy advised, "I am terminating any professional relationship we have." Because Dorothy was concerned Wagner or Flugge might pursue a claim against him for malpractice, he sought the mutual release of all attorneys involved in this matter. Dorothy did not advise Flugge in writing that he should obtain independent legal representation concerning this release. Dorothy filed a motion to withdraw as Flugge's counsel on May 20, 1997. It was granted by the trial court. Flugge subsequently filed an ethical complaint against Dorothy with the State Bar.

[¶ 14.] The Board found Dorothy violated Rules 1.1, 1.2(a), 1.5, 1.8(h), 2.1 and 8.4 in regards to this matter. The Board recommended Dorothy be publicly censured.

[¶ 15.] On May 8, 1998, Circuit Judge Jack Von Wald was appointed referee by this Court to take evidence and make findings concerning this case. The referee agreed with the Board that Dorothy had violated the above cited Rules of Professional Conduct; however, the referee did not agree that Dorothy should be publicly censured for his conduct. The referee noted that (1) Dorothy had no previous complaints made against him to the Board which were found to have been meritorious; and (2) Dorothy no longer does legal work involving domestic relations. The referee recommended a private reprimand would be appropriate discipline for Dorothy.

## STANDARD OF REVIEW

[¶ 16.] The Board and the referee conducted hearings and made findings, conclusions, and recommendations that Dorothy should be disciplined. We give careful consideration to their findings as they had the advantage of seeing and hearing the witnesses. *Matter of Claggett,* 1996 SD 21, ¶ 9, 544 N.W.2d 878, 880 (citing *In re Discipline of Jeffries,* 500 N.W.2d 220, 225 (S.D.1993)). However, this Court gives no particular deference to a referee's recommended sanction. *Id.* (citing *In re Discipline of Dana,* 415 N.W.2d 818, 822 (S.D.1987)). "Although we may adopt the findings of a referee, it does not necessarily follow that we will also adopt the recommendations." *Id.* (citing *Dana,* 415 N.W.2d at 822) (citing *In re Discipline of Rensch,* 333 N.W.2d 713, 714 (S.D.1983)). "The ultimate decision for discipline of members of the State Bar rests with this Court." *Id.* (quoting *Jeffries,* 500 N.W.2d at 225) (quoting *In re Discipline of Stanton,* 446 N.W.2d 33, 42 (S.D.1989)).

## LEGAL ANALYSIS

**[¶ 17.]** *1. Unreasonable Fees–The Hoover Complaint.*

■ **[¶ 18.]** This Court is not in the practice of setting attorney's fees. It is for this reason that in writing this opinion, this Court is · not attempting to draw a bright line on what constitutes an unreasonable attorney's fee. We are neither establishing a fee schedule. Indeed, the issue of whether an attorney has charged an unreasonable fee is a difficult one, because "[f]ew, if any, areas of attorney discipline are as subject to differing interpretations as the matter of what constitutes an excessive attorney's fee." *In re Kutner*, 78 Ill.2d 157, 35 Ill.Dec. 674, 399 N.E.2d 963, 966 (1979) (quoting *The Florida Bar v. Moriber*, 314 So.2d 145, 148 (Fla.1975)). However, this Court *is* in the practice of protecting the public from lawyer misconduct, thus, this issue warrants serious discussion.

■ **[¶ 19.]** This case presents us with a matter of first impression in South Dakota: should a lawyer in this case who attempted to charge a client nearly $60,000 (and did charge her in excess of $47,000) for representation in fees and costs concerning child custody and support issues be disciplined for charging unreasonable fees? We must thoroughly examine the merits of this case, as well as the overall propriety of what our decision would mean to the South Dakota Bar and the public at large. We are mindful of the "purpose of the disciplinary process—to protect the public [from further attorney misconduct], not to punish the lawyer." *Petition of Pier*, 1997 SD 23, ¶ 8, 561 N.W.2d 297, 299 (citing *Matter of Simpson*, 467 N.W.2d 921, 921–22 (S.D. 1991); *Stanton*, 446 N.W.2d at 42; *Matter of Strange*, 366 N.W.2d 495, 497 (S.D. 1985)). Moreover, a further purpose is the deterrence of like conduct by other attorneys. *Matter of Tidball*, 503 N.W.2d 850, 856 (S.D.1993); *Matter of Swartz*, 141 Ariz. 266, 686 P.2d 1236, 1247 (1984) (citing *Matter of Mercer*, 126 Ariz. 274, 614 P.2d 816 (1980)).

**[¶ 20.]** Members of the South Dakota Bar are governed by the South Dakota Rules of Professional Conduct. SDCL ch. 16–18 App. The Board contends Dorothy specifically violated Rule 1.5[1] in handling the Hoover case. The Board concluded Dorothy engaged in discovery and trial tactics which served only to complicate and extend the proceedings which resulted in unreasonable fees and costs for his client. The Board concluded Dorothy also violated the following rules:

1.1 which requires "competent representation to a client";

1.2 (e) which requires advising the client of "relevant limitations on the lawyer's conduct";

1.3 which requires "reasonable diligence";

1.4 which requires reasonable explanation of a matter to clients;

---

1. Rule 1.5, "Fees," provides in pertinent part:

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
   (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
   (2) the likelihood, if apparent to the client that the acceptance of the particular employment will preclude other employment by the lawyer;
   (3) the fee customarily charged in the locality for similar legal services;
   (4) the amount involved and the results obtained;
   (5) the time limitations imposed by the client or by the circumstances;
   (6) the nature and length of the professional relationship with the client;
   (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
   (8) whether the fee is fixed or contingent.
(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation. SDCL ch. 16–18 App. Rule 1.5.

1.16 which provides a lawyer may withdraw if the "client insists upon pursuing an objective that the lawyer considers ... imprudent" and

2.1 which requires the "exercise of independent professional judgment" and rendering of "candid advice."

■ [¶ 21.] Many courts including South Dakota now adhere to the American Bar Association's Model Rules of Professional Conduct.[2] Under Rule 1.5, the benchmark for triggering judicial review of fees has been lowered and its scope broadened. Cassandra M. Neely, Comment, *Excessive Fees and Attorney Disci-pline: The Committee on Legal Ethics v. Tatterson,* 90 WVa LRev 562, 569 (1987/88). Rule 1.5 requires a lawyer's fee must be "reasonable," thereby eliminating the previous requirement to show a fee is "clearly excessive" in order to warrant disciplinary action. *Id.* This rule sets out a list of factors for determining reasonableness of a fee. (*See* n1 of this opinion). Thus, for disciplinary action to be imposed, it is now only necessary that a fee be unreasonable in proportion to the services performed. *Neely,* at 569. When faced with a question about Rule 1.5[3] of the Model Rules of Professional Conduct, the ABA clarified:

---

**2.** This Court adopted the Model Rules of Professional Conduct and they became effective July 1, 1988.

**3.** While this Court has never before had the opportunity to decide what constitutes an "excessive" or "unreasonable" legal fee, many other jurisdictions have, and we look to their authority for guidance. Many states hold their lawyers to the standards of the Model Code of Professional Responsibility. Pursuant to the Model Code, disciplinary authorities have to prove a lawyer charged a "clearly excessive" fee to demonstrate an ethical violation. *Neely,* at 567. Under Disciplinary Rule (DR) 2–106(A), a fee must be either "illegal or clearly excessive" to warrant possible discipline. *Id.* The ABA Code of Professional Responsibility forbids the exaction of an illegal or clearly excessive fee, and provides a somewhat hazy standard for determining when a fee is excessive. 7 AmJur2d § 277. "Clearly excessive" is defined in DR 2–106(B), "[a] fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." *Neely,* at 567. DR 2–106(B) also provides the same non-inclusive list of eight factors as South Dakota's rule 1.5 to be considered in determining whether a fee is in excess of "reasonable."

Some of the courts that follow the Model Code have required a showing of unconscionability or fraud in order for disciplinary action to be imposed, despite the Model Code's focus on reasonableness under the totality of the circumstances. *See Kutner,* 35 Ill.Dec. 674, 399 N.E.2d at 965; *Bushman v. State Bar,* 11 Cal.3d 558, 113 Cal.Rptr. 904, 522 P.2d 312, 314 (1974); *Florida Bar v. Quick,* 279 So.2d 4, 7 (Fla.1973); *Florida Bar v. Winn,* 208 So.2d 809, 811 (Fla.1968), *cert.* denied, 393 U.S. 914, 89 S.Ct. 236, 21 L.Ed.2d 199 (stating "controversies as to the amount of fees are not grounds for disciplinary proceedings unless the amount demanded is extortionate or the demand is fraudulent."). In examining claims of excessive attorney fees, Louisiana courts interpret "clearly excessive" to mean "so grossly out of proportion with the fees charged for similar services by other attorneys in the locale as to constitute an unquestionable abuse of the attorney's professional responsibilities to the public." *Gibson v. Burns,* 505 So.2d 66, 69 (La.App.1987).

The Iowa Supreme Court recently examined an excessive attorney's fee in *Iowa Supreme Court Board of Professional Ethics and Conduct v. Hoffman,* 572 N.W.2d 904 (Iowa 1997). Attorney Hoffman entered into a contingent fee contract with a client to represent her in an attempt to recover damages arising out of the employment-related wrongful death of her husband. Counsel for the employer resisted the partial commutation, claiming Hoffman's fees were "unwarranted and excessive." *Id.* at 906. The Iowa Supreme Court held the Disciplinary Board demonstrated by a convincing preponderance of the evidence that Hoffman attempted to collect an excessive fee for his work on the workers' compensation claim in violation of DR 2–106. *Id.* at 909. The court found that a six-month suspension of Hoffman's license was fully justified. *Id.* at 910. Finally, the court noted:

The members of the grievance commission heard [Hoffman's] proffered reasons for seeking the partial commutation as well as testimony on the alleged mitigating factors firsthand and were unconvinced. [Hoffman's] ethical violation in attempting to collect an excessive fee is compounded by his attempt to mislead the grievance commission and this court with untenable excuses for seeking such a fee.

From the legislative history of Rule 1.5 and the mere substitution of 'reasonable' in the Rule for 'clearly excessive' in the Disciplinary Rule in otherwise parallel provisions, it appears clear that there was no intent to change the basic thrust of the DR from a prohibition against excessive fees to a 'minimum fee' standard. The intent was simply to impose a stricter standard on lawyers who would charge too much, by changing the 'clearly excessive' test to a test of reasonableness.

ABA Comm. on Ethics and Professional Responsibility, Informal Op 84–1509 (1984).

[¶ 22.] Arizona courts, like South Dakota, promulgated their ethical rules after the ABA Model Rules of Professional Conduct. In *Matter of Struthers*, 179 Ariz. 216, 877 P.2d 789 (1994), the court found that the attorney's fee charged was unreasonable in relation to the work performed and in violation of Ethical Rule 1.5(a).[4] *Id.* at 796. The court reiterated a principle from the *Swartz* case:

We have stated before and state again: 'a fee agreement between lawyer and client is not an ordinary business contract.' Although the lawyer is certainly free to consider his own interests, the primary concerns are those of the client. Fees must be reasonably proportional to the services rendered and to the situation presented.

*Id.* at 796 (citing *Swartz*, 686 P.2d at 1243) (internal citations omitted).

[¶ 23.] In California "[i]t is settled that gross overcharge of a fee by an attorney may warrant discipline." *Bushman*, 113 Cal.Rptr. 904, 522 P.2d at 314. California courts utilize this test: "[t]he test is whether the fee is 'so exorbitant and wholly is disproportionate to the services performed as to shock the conscience.'" *Id.* (citing *Herrscher v. State Bar* (1935), 4 Cal.2d 399, 401–02, 49 P.2d 832, 833 (quoting *Goldstone v. State Bar* (1931), 214 Cal. 490, 498, 6 P.2d 513)). The Supreme Court of California in *Bushman* suspended an attorney from the practice of law for one year for charging and attempting to collect an exorbitant and unconscionable fee from clients. *Id.* at 313. Bushman was retained in connection with an action for divorce and custody of a minor child where the only substantial issue was custody.

[¶ 24.] Eventually the custody issue was resolved by a stipulation of the parties in favor of Bushman's client. The Court found there was nothing unusual or novel in the pleadings or research in this case. *Id.* The Court held that "under all the circumstances, the fee charged by Bushman was so exorbitant and wholly disproportionate to the services rendered to the [clients] as to shock the conscience." *Id.* at 315. Although Bushman asserted the case was "quite involved,"[5] the court found he was unable to articulate any complex issues which required extensive research or specialized skills. *Id.* The court found the disciplinary board'sconclusion that the only substantial issue related to child custody, was supported by the record. *Id.* at 316.

[¶ 25.] In the case at bar, both the Board and referee found Dorothy violated, among

*Id.* at 909.

**4.** ER 1.5(a), "Fees," is the equivalent of South Dakota's SDCL ch. 16–18 App. Rule 1.5.

**5.** The facts of this case are somewhat similar to the case at bar, because it involved an attorney charging an excessive fee in a child custody case. Moreover, in *Bushman*, the attorney attacked the finding of the disciplinary board that the only substantial issue involved was child custody. Bushman contended at the time of the signing of the promissory note there was the possibility of a statutory rape charge against one of the parties involved. *Bushman*, 113 Cal.Rptr. 904, 522 P.2d at 316. Dorothy, in the case before us, claims the issues in this case were more complicated than a simple custody action in that there were some allegations of abuse by one of the parents involved in the case. Dorothy claims he had to perform extensive discovery in investigation of these allegations.

others, Rule 1.3, which states, "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Courts have noted the importance of efficiency in determining an appropriate amount of attorney's fees. *See In re Midway Airlines, Inc.*, 1991 WL 277767, at *7 (Bankr.N.D.Ill.1991) (ruling law firm's fees were blatantly excessive when the firm had expended an unnecessary and unreasonable amount of time on tasks which were relatively simple).

[¶ 26.] In the matter before us, the referee's findings of fact and conclusions of law indicate Dorothy also violated Model Rule 1.5(b). This rule imposes an affirmative duty on attorneys to provide information about billing practices to their clients.[6] Rule 1.5(b) states, "[w]hen the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing...." Directly correlated to this rule is Model Rule 1.4, which states, "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information" and "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." While the comment to Model Rule 1.4 implies the rule is usually applicable to negotiations or litigation, the drafters of Opinion 93–379 indicated the principle can be applied to the lawyer's obligation to explain billing methods as well. Sonia S. Chan, Note, *ABA Formal Opinion, 93–379: Double Billing, Padding and Other Forms of Overbilling*, 9 Geo J Legal Ethics 611, 619 (1996).

[¶ 27.] This Court has held when a fee is challenged as excessive, the attorney claiming the fee is required to produce competent evidence to demonstrate the value of his services. *In re Estate of Schuldt*, 428 N.W.2d 251, 256 (S.D.1988).

The attorney has the burden of proving his fee is justified and reasonable. *Id.* In this case, Dorothy has made detailed accounts and explanations for his fees. For instance, in an eighty-eight-page letter to Mike Schaeffer, a member of the Board, dated September 26, 1997, Dorothy wrote:

Mr. Hoover created 3–ring binders full of various charts, graphs and analyses regarding Mike Grage's financial information and the Hoover's financial information, and sent them to me for my review. Exhibits 6, 7, and 8 are examples. These are trial Exhibits 3, 4, and 5 in Dorothy Law Firm P.C. v. Thayer and Cindy Hoover, which, for reasons I will explain later, I do not believe Judge Tucker ever read. I do not know if you want to spend the hours it takes to review those materials, but I read them, analyzed them, and commented on them at the request (indeed, at the insistence) of Mr. Hoover. My itemized timeslips show the time spent by me on the review of these materials, and my discussions with him about them. I repeatedly advised Mr. Hoover that I felt he needed to simplify these reports into one or two summary pages because I did not feel Judge Severson would want to read voluminous materials. Mr. Hoover revised them several times at my request, but he just could not summarize the materials. He felt that each summary and analysis was important and proved another point he wanted to make. (p. 11–12).

Dorothy also wrote:

Mr. Hoover sent me 10 books of materials to use at the hearings. Many were large 3–ring binders, which he wanted me to introduce without revision to Judge Severson. I refused to do that. I told him that Judge Severson would not read 10 books of documents, and that I was not comfortable introducing documents that I had not reviewed or

---

6. The referee noted Dorothy did not prepare a written fee agreement before initiating representation of the Hoovers.

verified the accuracy of, or determined the relevancy of. I spent hours reviewing these "books," and trying to get Mr. Hoover to summarize and reduce the number of documents he wanted to introduce. My timeslips itemize the hours spent. (p. 19).

[¶ 28.] In this letter, Dorothy also pointed to the fact Judge Tucker refused to admit a report into evidence from a psychologist who did a psychological testing of the Hoovers and the Grages in Dorothy v. Hoover. Dorothy cites to Dr. Arbes' "summary and recommendations":

> This has clearly been one of the most time-consuming and involved custody evaluations that this evaluator has undertaken in a number of years. The dynamics of the situation, as presented by the various parties involved, is extremely complex .... (p. 15).

However, despite the above, Judge Tucker found that Dorothy's representation increased the duration of this case and the cost. Judge Tucker held:

> Judge Severson noted briefing was overly extensive. The "Prehearing Memorandum" submitted by Dorothy prior to the continued trial in May of 1994 was 68 pages in length. Its avowed purpose was to acquaint the judge with the law and to reacquaint the judge with the facts. However, there were no unique or complex issues of law in this case and the facts were covered in great detail. This brief was submitted to the trial court only four days prior to hearing. The brief cost the Hoovers several thousands of dollars, and was of little or no value.

Judge Tucker's decision also cited to another occasion where the Hoovers were traveling to meet with Dorothy and ran out of gas near Brandon. The Hoovers phoned Dorothy to advise him they would be late. Dorothy offered to drive out to give them some gas and then billed them $100/hour to do so.

[¶ 29.] Judge Tucker reviewed the factors set out in Rule 1.5(a), and concluded "a good deal of time was necessary in this case, but not nearly to the extent provided. The legal issues presented were not novel or complex." [7] This Court has observed "[d]efending most divorce actions is generally not novel or difficult and ordinarily should not involve excessive amounts of time." *Stanton v. Saks*, 311 N.W.2d 584, 585 (S.D.1981). In *Saks*, this Court found the attorney's oral fee agreement was ambiguous and that the number of hours billed for certain procedures and documents were excessive. *Id.* In so holding, this Court held "[t]his Court and the trial court may be considered experts upon the value of legal services." *Id.* at 585 (citing *Wright v. Wright*, 58 S.D. 612, 237 N.W. 896 (1931); *Egan v. Burnight*, 34 S.D. 473, 149 N.W. 176 (1914); 7A CJS Attorney and Client, § 329).

[¶ 30.] Grages and the maternal grandparents were represented by counsel in this matter and met Hoover's legal maneuverings step-by-step. Yet Grages incurred a fee of $16,309.40 and the grandparents incurred a fee of $19,869.04 in comparison to Dorothy's claim for fees of $45,100.35.

[¶ 31.] Considering investigation of a claim, discovery and trial preparation, we recognize it may take more time to prepare a case by the moving party than a nonmoving party. However, here both the Board and referee found Dorothy improperly told Cindy Hoover when she wanted to halt the proceedings, she had a good case and would get all her attorney's fees back when she won. Cindy testified Dorothy told her if she stopped the litigation, it would cost her Grages' attorney's fees, past child support and future child support in addition to the full amount of Dorothy's

---

7. However, Judge Tucker did not rule on the propriety of the total amount of Dorothy's fees as that was not directly in issue. The issue was Dorothy's claim for additional payment, which the Judge refused.

attorney's fees.[8] Not surprisingly she opted to continue the proceedings and the fees correspondingly continued to accumulate.

[¶ 32.] After an extensive review of the voluminous record in this case, we find Dorothy charged the Hoovers an unreasonable fee in violation of Rule 1.5. In so holding we do not attempt to set a bright line rule based on the amounts involved here or for that matter, any specific amount. There may well be custody cases which justify fees of this nature or more depending on the facts and the application of the factors cited herein. However, this Court has long ago taken the position that it will not sit idly by while clients are financially abused by officers of the bar:

> We would be grossly derelict in the discharge of our highest duty if we disregarded the direct reflection upon the courts and the consequent loss of public confidence and trust in that most important institution of government which must inevitably result from any sharp or unconscionable dealings by its representatives as such. To provide what we regard as necessary and wholesome protection to the reputation of the courts and the bar, as well as to the interests of the public they serve, we align ourselves with those courts which hold that when a lawyer is bargaining with a prospective client, if the provision made for his compensation is so unreasonable and excessive, when viewed in the light of the circumstances of the particular case, as to evince a fixed purpose on his part to obtain an undue advantage over his prospective client, the contract should not, and will not, be upheld.

*Ofstad v. Beck,* 65 S.D. 387, 274 N.W. 498, 503 (1937).

[¶ 33.] We agree with the Board and referee that Dorothy violated Rules 1.1, 1.2(e), 1.3, 1.4, 1.5, 1.16, 2.1, and 8.4 in his representation of Cindy Hoover.

[¶ 34.] *2. Dorothy's withholding of the trust account check-The Flugge Complaint*

[¶ 35.] Dorothy's withholding of the $455.72 trust account check is governed by Rule 1.15(2)(d), which states "[a] lawyer shall ... [p]romptly pay or deliver to the client as requested by a client the funds, securities or other properties in the possession of the lawyer which the client is entitled to receive." SDCL ch. 16–18 App. Rule 1.15. It is also a violation of Rule 1.15(b) which provides, in pertinent part:

> Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

SDCL ch. 16–18 App. Rule 1.15. Dorothy received the trust account check on August 24, 1994 from Wagner's attorney, Fischer. This check was to be paid in satisfaction of judgment as to Flugge's breach of contract claim. Dorothy should have notified Flugge immediately upon receipt of this check. "Even if a client expects the lawyer to receive funds on the client's behalf, the lawyer has an affirmative duty to notify the client promptly and expressly when the lawyer in fact receives the funds." *In re Conduct of Starr,* 326 Or. 328, 952 P.2d 1017, 1022 (1998). However, Dorothy claims he misplaced the trust account check in the wrong Flugge file. The

---

**8.** Although not at issue in this case, it should be noted that under SDCL 16–18–26(2) it is a class 2 misdemeanor for an attorney to "intentionally delay his client's suit with a view to his own gain," and under SDCL 16–18–28 such a violation shall result in treble damages against the offending attorney. *See Tidball,* 503 N.W.2d at 855 ( citing *In re Rude, 88 S.D. 416, 221 N.W.2d 43 (1974)*).

Board concluded this conduct led to the attempt to execute and recover on a judgment (which Dorothy knew or should have known was erroneous), and to protracted legal proceedings to correct the levy and execution and unnecessarily increased the cost and expense of the Flugge litigation. We agree.

[¶ 36.] Dorothy claims Flugge was not entitled to receive the $455.72 in dispute as it was part of his fee. Such disputes are addressed by Rule 1.15(c) which provides: "[i]f a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved." In *Tidball*, 503 N.W.2d at 855, this Court held an attorney's failure to promptly pay over to a client funds or assets violates disciplinary rules governing payment of funds to clients. *See also Disciplinary Proceedings Against Oppitz*, 157 Wis.2d 266, 459 N.W.2d 569, 572 (1990); *Wilkerson v. Olcott*, 212 So.2d 119, 121 (Fla.App.1968) (stating lawyer, upon demand by client, must account for and deliver over money or property which client entrusted to him). In *Tidball*, this Court looked to the Comments to Rule 1.15 as guidance in this type of situation:

> Lawyers often receive funds from third parties from which the lawyer's fee will be paid. If there is a risk that the client may divert the funds without paying the fee, the lawyer is not required to remit the portion from which the fee is to be paid. However, a lawyer may not hold funds to coerce a client into accepting the lawyer's contention. The disputed portion of the funds should be kept in trust and the lawyer should suggest means for prompt resolution of the dispute, such as arbitration. The undisputed portion of the funds shall be promptly distributed.

503 N.W.2d at 855. Dorothy clearly did not follow this procedure but instead claimed a possessory attorney's lien on the funds represented by the checks.[9] We find Dorothy was not entitled to hold the trust account check in the amount of $455.72. As a result of Dorothy's refusal to endorse the trust account check over to Flugge or promptly attempt to resolve the dispute, Flugge was forced to pay Fischer pursuant to the trial court's order with his own personal check.

[¶ 37.] Moreover, this Court agrees with the referee's conclusion that Dorothy never used the term "attorney's lien" in his correspondence to Flugge and never attempted to perfect any alleged attorney's lien in the manner required by law pursuant to SDCL 16–18–21 et seq. While a client has an obligation to pay his or her lawyer for legal work performed, the lawyer has no right to any particular property of the client, including proceeds of litigation, absent an agreement or statutory lien. *In re Haar*, 698 A.2d 412, 424 (D.C.App.1997).

[¶ 38.] We agree with the Board and referee that Dorothy violated Rules 1.1, 1.2(a), 1.5, 1.8(h), 2.1 and 8.4 in regards to the Flugge matter.

## DISCIPLINE CONSIDERATIONS

[¶ 39.] In determining an appropriate discipline, this Court reviews the totality of the attorney/client relationship to determine if any mitigating factors warrant consideration. *Matter of Bihlmeyer*, 515 N.W.2d 236, 239 (S.D.1994) (citing *Matter of Walker*, 254 N.W.2d 452 (S.D. 1977)). The referee in this case found: (1) Dorothy had no previous complaints made against him to the Board which were found to have been meritorious; and (2) Dorothy no longer does legal work involving domestic relations. While the first finding does favor Dorothy, in *Tidball* we specifically rejected the second as a valid argument for leniency:

---

9. In his April 28, 1997 letter to Flugge, Dorothy wrote: "I will endorse [the constable's check] and the cashier's check [$455.72] I sent you last week when our billing dispute is resolved."

The scope of our consideration is broader than the current status of [Tidball]. The fact that he has effectively removed himself from private practice may protect his would be clients, but all attorneys in this state are subject to these rules and all citizens of this state desire and deserve the protection afforded by the rules. *Matter of Discipline of Bergren*, 455 N.W.2d 856, 857 (S.D.1990). "[A]n application of common sense would show that the discipline for attorney misconduct also serves to deter similar conduct in the profession which, in turn, fosters and maintains the ethics of the legal profession." *Matter of the Discipline of Dana*, 415 N.W.2d 818, 823 (S.D.1987).

503 N.W.2d at 856. *But see Claggett*, where the misconduct was "foolish and negligent" rather than intentional. 544 N.W.2d at 881. Dorothy's actions clearly fall within the intentional category. Based on the totality of the circumstances which will be more fully developed, a refrain from practice in the field of domestic relations will not by itself, support imposition of a private reprimand rather than consideration of stronger discipline.

[¶ 40.] Dorothy argues the negative publicity he has received as a result of these proceedings, together with the costs he has incurred in defending himself, has resulted in a de facto public censure by the press and the Board. In *Matter of Discipline of Hopewell*, 507 N.W.2d 911, 917 (S.D.1993), we rejected a similar argument asking us to take no action against the offending attorney.

Even if this were the case, under Art. V, § 12 of our Constitution, this Court, and not the media nor any third party is solely charged with the responsibility for determining what is appropriate discipline in an attorney misconduct case.

[¶ 41.] We take into serious consideration the fact Dorothy refuses to acknowledge and admit his misconduct. *See Matter of Discipline of Lacey*, 283 N.W.2d 250, 253 (S.D.1979) (noting the fact attorney refused to acknowledge his wrongdoing as a disciplinary consideration). Of the seventeen ethical violations the Board and the referee found he committed, Dorothy at oral argument before this Court, declared himself unconditionally not guilty of sixteen and conceded a violation of only a minor allegation.[10]

[¶ 42.] Instead he has proceeded to blame numerous other individuals as the cause of this situation. Dorothy blames the "win at any cost" attitude of his clients, the Hoovers, as a source of his problem with the attorney fee issue. He also claims Judge Gene Paul Kean, although not presiding at the trial over Dorothy's claim for additional fees, was in contact with the judge presiding, Judge Tucker, during the course of the proceedings and went into chambers with Judge Tucker during recesses. Dorothy has provided no proof Judge Tucker was contacted by, or influenced by Judge Kean concerning the merits of the collection proceeding. Dorothy also has criticism against his client Flugge and against Judge Srstka[11] who presided over the Flugge matter.

10. At oral argument Dorothy conceded he violated Rule 1.16 which allows the attorney to withdraw if the "client insists upon pursuing an objective that the lawyer considers ... imprudent." However in his subsequent final written response, without reservation he declared he "violated no ethical provision ...."

11. Dorothy's criticism of Judge Srstka was as follows:

Srstka, seeing what was occurring here, found a way to take that judgment that was unsatisfied and reduce it by the cost that

had never been assessed, interest by creating a judgment that had been executed on that shouldn't have been executed on. And that's good legal mechanics. I am not at all convinced that's good justice. It puts Dick Flugge in a position where because of that legal mechanics, he now is going to face Gale Fisher saying either you pay me 5,000 bucks or I am going to file a rule 11 against you because you filed a rule 11 that you withdrew.

[¶ 43.] Dorothy found substantial fault with Judge Von Wald who was appointed by this Court to sit as a referee in this matter. Despite the fact Judge Von Wald recommended only a private reprimand rather than adopt the Board's previous recommendation of public censure, Dorothy strongly complained to this Court about Judge Von Wald's decision-making abilities.[12]

[¶ 44.] However, the most vitriolic criticism was reserved for Judge Tucker who refused to grant Dorothy additional attorney's fees. Dorothy accused Judge Tucker of setting out to control the trial, close the file, and "his objectivity, fairness and thoroughness were adversely affected, and he issued a bad ruling." Dorothy also declared Judge Tucker to be "negligent in the manner in which he handled [the case]," "made inflammatory comments about my handling of the case without ever reading the exhibits," and "Judge Tucker's opinion [was] reached after the improper and irregular manner that he handled the collection matter."

[¶ 45.] Dorothy asserts Judge Tucker failed to read certain exhibits and documents from the *Grages* case. These materials consisted of seven three-ring binders filled with charts, graphs and other information prepared by Thayer Hoover in preparation for trial. Both at the Board and referee hearings, Dorothy accused Judge Tucker of failing to review these materials. Dorothy stated:

> Obviously we cranked out law and not justice and it wasn't a fair decision. Obviously Tucker didn't even read some of the materials. He could not have read all of the materials. So he decided this on oral testimony alone.

Dorothy also testified:

> [W]hen I experienced what I did in front of Judge Tucker where I knew that important written materials that explained why I had spent the hours I had in this case were not read and that he had decided to control this trial, not

---

12. Dorothy's criticism of Judge Von Wald, which has no factual basis in the record, is as follows:

> Judge Von Wald is a Circuit Court Judge. He is rightfully proud of being a member of the South Dakota Judiciary. He believes that Judges, as a general rule, have legal skills equal to or superior to private practitioners. Consequently, another Judge's decision is to be given great deference. He believes that Judges have a duty to oversee the activities of lawyers who appear before them, including determining whether the fees a lawyer charges [are] reasonable from a Judge's prospective. He believes the Disciplinary Board is an extension of the Judicial Branch that he is a member of, and that their decisions should be given great deference. For him to conclude that Judge Srstka made various decisions that kept Mr. Flugge at risk of litigation expenses if he did not settle a questionable claim, and that those decisions caused Mr. Flugge to take out his frustration and anger on his attorney, Mr. Dorothy, was not consistent with his preconceived notions of how another member of the bench would handle litigation, or how clients react to Judges' decisions. For him to conclude that Judge Tucker had irregularly handled Dorothy Law Firm's collection action against the Hoovers, and that such handling caused Judge Tucker to reach a conclusion that was not consistent with the documentary evidence he admitted into evidence (i.e. he had placed undue emphasis on the oral testimony of the Hoovers when the documentary evidence he admitted into evidence revealed that these oral statements were inconsistent with prior sworn statement of the Hoovers) was not consistent with his preconceived notions of how Judges handle their cases. To accept the fact that the Disciplinary Board had based its decision in considerable part on the validity of Judge Tucker's findings and opinions, was inconsistent with his preconceived notions of the validity of Judge's decisions and the Disciplinary Boards right to rely on such decisions. To have accepted these facts would have caused significant cognitive dissonance. So, the facts Judge Von Wald's mind focused on and gave weight to were those that were consistent with his preconceived notions and that eliminated cognitive dissonance. He could not empathize with Mr. Dorothy because, as a Judge, he could not imagine being told he would not receive a month's salary because of the outcome of a matter he handled, which is what the Hoovers did to Mr. Dorothy.

allow the usual progression and flow of testimony and direct and rebuttal, and take just oral testimony and make his decision based on that, I lost a lot of faith in the system that we work in, folks.

However, when the trial transcript in Dorothy v. Hoover is examined, it is clear Dorothy did not ask Judge Tucker to read the seven binders. The transcript indicates Dorothy introduced the seven books of voluminous information to show just that – that they were voluminous.[13]

[¶ 46.] Dorothy specifically accused Judge Tucker of violating Canons of Judicial Ethics, 3.3, 3.7, 3.8 and SDCL 15–14–1, yet he neither appealed the Judge's decision nor did he file a complaint with the Judicial Qualifications Commission.

[¶ 47.] The Board found the complaints by Dorothy against the judges and

the judicial system to be unsupported by the record, beyond reasoned disagreement of an interpretation of fact or law and an ethical violation.[14] We agree. This clearly was not an isolated incident where emotions of the moment in the heat of litigation overcame better judgment. *In re Snyder,* 472 U.S. 634, 647, 105 S.Ct. 2874, 2882, 86 L.Ed.2d 504, 514 (1985). The worst of it was prepared or written out in advance with sufficient time to reflect on the inflammatory contents of the statements before they were delivered. In addition, Dorothy could not let it be. These repeated unprofessional attacks continued up to the final close of this appeal record. *Hopewell,* 507 N.W.2d at 917.

[¶ 48.] The Nebraska Supreme Court has recently stated:

> "Care with words and respect for courts and one's adversaries is a necessity, not

13. This is evident from the colloquy between the court and Rick Yarnall, Dorothy's attorney:

> Mr. Yarnall: Your Honor, we are going to move for the admission of Grages versus Grages divorce file, and I didn't want to copy books one through seven and hand them out. That's the only purpose – I'm asking the Court to take judicial notice of books one through seven in the Grages versus Grages file.
> Court: What's the purpose, just to show that they are big?
> Mr. Yarnall: Yes. The amount of work that was required by Attorney Dorothy in this case and the voluminous documents and the amount of documents that were prepared by Dr. Thayer [Hoover], reviewed by counsel.
> Court: Is it a fair estimate that those books would comprise
> approximately 18 inches of material?
> Dorothy: Twenty-four, probably.
> Court: Would 18–24 inches in those books be accurate, Mr. Hoover?
> Mr. Hoover: Yes.
> Court: Rather than accept the exhibits, which will only clog this file, and their only purpose is to show how big they are, the Court will take judicial notice that books one through seven in the original divorce file are approximately 18–24 inches thick. *Is that fair?* (emphasis added).
> Mr. Yarnall: *Yes.* (emphasis added).

It is clear the court gave Dorothy and Yarnall full opportunity to argue for the admission of

the seven binders on the basis that they be read by the trial court but they chose not to do so. Dorothy cannot now argue in hindsight Judge Tucker was negligent in failing to do something Dorothy did not even request him to do, if indeed reading all this material was necessary to a resolution of this case in the first place.

14. Even Dorothy's trial counsel, Yarnall, did not share Dorothy's critical view of Judge Tucker's handling of the trial. Yarnall testified that prior to trial he told Dorothy, the claim for additional attorney's fees may not find favor with the trial court:

> A: We tried the case, we presented the evidence to the judge, and the judge decided not to award any fees. And there was that possibility from the get-go because I told Mr. Dorothy that if they are going to try to make some equitable adjustment somewhere, it may be that you would get nothing and that would be the end of it, and that's exactly what happened in the case ... when it was all said and done to each party to walk away and that was the end of it was probably a decision I see that Judge Tucker was doing as a matter of equity and that was the end of it.
> ....
> Q: Did you feel that Judge Tucker had made errors in judgment that resulted in an *erroneous conclusion that Mr. Dorothy receive nothing?*
> A: No ...

because lawyers and judges are without fault, but because trial by combat long ago proved unsatisfactory.

. . . .

"The profession's insistence that counsel show restraint, self-discipline and a sense of reality in dealing with courts, other counsel, witnesses and adversaries is more than insistence on good manners. It is based on the knowledge that civilized, rational behavior is essential if a judicial system is to perform its function. Absent this, any judicial proceeding is likely to degenerate into [a] verbal free-for-all. . . . [H]abitual unreasonable reaction to adverse rulings . . . is conduct of a type not to be permitted of a lawyer when acting as a lawyer."

*In re Converse*, 258 Neb. 159, 602 N.W.2d 500, 508 (1999) (citing *Appeal of Lane*, 249 Neb. 499, 544 N.W.2d 367, 376 (1996)). Distinguishing between reasoned comment protected by the First Amendment and unprotected, unprofessional statements goes back nearly to the establishment of an organized bar in this State:

> [T]here can be such an abuse of the freedom of speech and liberty of the press as to show that a party is not possessed "of good moral character," as required for admission to the bar of this state . . . and therefore to require that such person be excluded from the bar of this state; and to our mind the evidence submitted here shows such an instance

. . . "Nor can the respondent be justified on the ground of guaranteed liberty of speech. When a man enters upon a campaign of villification, he takes his fate into his own hands, and must expect to be held to answer for the abuse of the privilege extended to him by the Constitution. . . ."

*In re Egan*, 24 S.D. 301, 326–27, 123 N.W. 478, 488 (1909). *See also In re Gorsuch*, 76 S.D. 191, 75 N.W.2d 644, 648–49 (1956); *Converse*, 602 N.W.2d at 509.

[¶ 49.] Dorothy further represented to this Court at oral argument and subsequently in writing that Judge Severson and attorneys Rick Yarnall, Tom Farrell, and Rory King testified before the referee that Dorothy's conduct violated no ethical rules. Concerned the record did not support this blanket claim, this Court gave Dorothy the opportunity to point to specific citations in the record to justify this argument.[15] At specific points in their testimony, both Farrell and King testified that, in their opinion, Dorothy did not violate any ethical rules. However, we find it of importance that Farrell, opposing counsel in the Hoover matter, did testify the Dorothy fee request was "extraordinary," "prima facie . . . exorbitant," "shocking" and material submitted by Dorothy was "unreasonable and unnecessary."[16] Although King testified he did not feel Dorothy's fee to be unreasonable, he did state the fee was "high," and conceded had Mrs.

---

15. This Court issued an Order to Show Cause, giving Dorothy an opportunity to respond with specific citation to the record to support his contentions. Dorothy twice exercised his right of response.

16. Farrell further limited his opinion of Dorothy's conduct by the following testimony:
    Q: Would you submit documents, exhibits, notebooks to the Court if
    you felt it were imprudent to do so?
    A: No
    Q: Do you feel that the ethical rules would prohibit you from doing
    that?
    A: Yeah, I believe so . . . [w]hen you know you can't control the situation that it would behoove you to withdraw from the case . . .

. . . .
Q: And would you agree that a lawyer is not required to pursue objectives or employ means simply because the client may wish the lawyer to do so?
A: [I]f you have a client that's out of control and wants to present stuff to the Court that's irrelevant or immaterial or overburdensome and you can't talk him out of it, then I think you ought to withdraw.
Q: Did you see any of that in the Grages matter, any material that you felt was unreasonable and unnecessary?
A: The face of it I think would show that, yeah. There were charts and graphs and checks and stuff and exhibits that were unduly burdensome. No doubt about it.

Hoover told Dorothy she wanted to halt the proceedings and he failed to do so, that would be a violation of the Canons.

[¶ 50.] Contrary to Dorothy's assertion, it appears from the record Judge Severson did not wholeheartedly agree Dorothy was free of any ethical violations. At the referee hearing, when asked whether he believed Dorothy violated Rule 1.1, "Competence," Judge Severson testified: "[i]t's more complicated than a one word answer. The entire matter was disproportionate to the issues that were involved." Further, when asked if he believed Dorothy violated Rule 1.3, "Diligence," Judge Severson stated:

> Whether or not you were diligent, no, I have no problem with the fact that you were – you were diligent in this matter. Again, either in a rule or one of the others talks about whether or not the – that the work must be proportionate, and again I don't know whether it was driven by you or your client that it was – this case was disproportionate to the issues involved.

Yarnall testified he did not have an opinion either way when asked if Dorothy violated Rule 1.5.

[¶ 51.] Dorothy represented himself at the Board hearing, referee hearing and before this Court, and participated in the examination of these witnesses and heard their testimony. We are troubled with the fact Dorothy did not display candor with this Court. While two of the four witnesses in this disciplinary proceeding may have made statements to the effect Dorothy did not violate any ethical rules, these statements were clarified with subsequent qualification; and other witnesses did not give the wholehearted endorsement of Dorothy's conduct he would have us believe. Rule 3.3 requires candor toward this Court as well as other tribunals. " 'Candor' means to treat a subject with fairness, impartiality, and to be outspoken, frank, and veracious, and is synonymous with other terms describing morality." *Joiner v. Joiner*, 87 S.W.2d 903, 905 (Tex.

Civ.App. 1935), *rev'd* on the issue of property division, 131 Tex. 27, 112 S.W.2d 1049 (Tex.Com.App. 1938). This Court has stated:

> We cannot overemphasize the importance of attorneys in this state being absolutely fair with the court. Every court ... has the right to rely upon an attorney to assist it in ascertaining the truth of the case before it. Therefore, candor and fairness should characterize the conduct of an attorney at the beginning, during, and at the close of the litigation.

*Bihlmeyer*, 515 N.W.2d at 239; *see also Burns v. Windsor Ins. Co.*, 31 F.3d 1092,-1095 (11th Cir.1994) (noting every lawyer has a duty of candor to the tribunal); *United States v. Associated Convalescent Enterprises, Inc.*, 766 F.2d 1342, 1346 (9th Cir.1985) (stating an attorney has duty of good faith and candor in dealing with the judiciary). "Selective omission of relevant information, ... 'exceeds the bounds of zealous advocacy and is wholly inappropriate.' " *Gum v. Dudley*, 202 W.Va. 477, 505 S.E.2d 391, 400 n.14 (1997) (quoting *Montgomery v. City of Chicago*, 763 F.Supp. 301, 307 (N.D.Ill.1991)). Attorneys have a responsibility to present the record with accuracy and candor. *Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 833 (8th Cir.1992). The record in no way supports Dorothy's contention all these witnesses absolutely absolved him of any wrongdoing.

## CONCLUSION

[¶ 52.] Appropriate discipline is determined upon a consideration of the seriousness of the misconduct by the attorney and the likelihood of repeated instances of similar misconduct. *Claggett*, 1996 SD 21, ¶ 14, 544 N.W.2d at 880; *Tidball*, 503 N.W.2d at 856. We are mindful that for twenty years Dorothy conducted himself and his legal practice at such a professional level that not one valid ethical complaint was lodged against him. Nevertheless the record supports the findings

of misconduct on all the charges as determined by the Board and the referee concerning the Hoover and Flugge matters.

[¶ 53.] The disciplinary options at this Court's disposal are defined in SDCL 16–19–35 as: private reprimand, public censure, placement on probationary status, suspension for up to three years and disbarment. *Hopewell*, 507 N.W.2d at 918. We find the recommendation of private reprimand by the referee to be too lenient in this case.[17] Instead, we adopt the recommendation of the Board. This Court concludes the appropriate discipline in this case, based upon the Hoover and Flugge complaints, Dorothy's general lack of respect for the judicial system, its judges, his total lack of remorse and lack of candor before this tribunal, is public censure. Further conduct of this type may call for stronger discipline. Dorothy is to pay all costs [18] of this proceeding. SDCL 16–19–70.2.

[¶ 54.] MILLER, Chief Justice, concurs.

[¶ 55.] SABERS and AMUNDSON, Justices, concur with a writing.

[¶ 56.] KONENKAMP, Justice, deeming himself disqualified, did not participate.

17. In fairness to the Board and referee, substantial amounts of the improper comments by Dorothy occurred during the time the proceeding was in front of this Court and after the Board and referee had completed their review of the case.

18. Dorothy disputes the State Bar's request for $9,308.05 in attorney's fees as part of its costs. However, SDCL 16–19–70.2 authorizes recovery of attorney's fees as costs.

19. In Dorothy's final response brief to this Court, filed on November 2, 1999, Dorothy stated the following:

28. One could argue, as Mr. Zastrow does, that Judge Severson, Tom Farrell, and Rick Yarnall did not have a full understanding of all the pertinent facts as Judge Von Wald did, and that Judge Von Wald's opinion is, therefore, more credible than theirs. But, Rory King sat through the testimony of the hearing on the ethical allegations, and had over 40 hours reviewing the facts before they

SABERS, Justice (concurring).

[¶ 57.] I concur because Dorothy's conduct, his lack of remorse and his insistence that he did nothing wrong clearly justifies public censure under our cases. In fact, his conduct brought him dangerously close to suspension.

[¶ 58.] Dorothy's conduct demonstrates an ability to place a spin on the "facts" which may be brilliant legal gymnastics. However, the same conduct also shows a lack of professional judgment for such a seasoned lawyer. At times, it shows he was not smart enough to know when to quit. Obviously, he should have quit long before he started his criticism of the circuit court Judges.

AMUNDSON, Justice (concurring).

[¶ 59.] Dorothy has represented himself all through these proceedings. Along the way, this case has generated a blizzard of paper. In Dorothy's final response he argues that the referee's decision-making process was flawed. This was, he claims, caused by "two well-established, unconscious, psychological mechanisms of decision making, known as 'selective perception' and 'cognitive dissonance.' " [19]

were ever presented to Judge Von Wald. He reached the conclusion that Charles Dorothy violated no ethical provisions in representing the Hoovers or Mr. Flugge.

29. How could two well-trained, experienced, and respected lawyers, who observed the same testimony and reviewed the same Exhibits, come to diametrically opposed opinions?

30. How can reasonable legal minds, applying the same ethical rules to the same facts, come up with opposite conclusions?

31. In the opinion of the author of this Response, part of the reason is the operation of two well-established, unconscious, psychological mechanisms of decision-making, known as "selective perception" and "cognitive dissonance." [*See* Scott Plaus, *The Psychology of Judgment and Decision Making* Chapters 1 and 2 (McGraw–Hill, Inc., 1993) ].

32. "Selective perception" is the fact that all decision makers unconsciously identify, interpret, place value on, and even ignore, facts based upon preconceived

notions that are a result of their own experiences and beliefs, their concepts of themselves and those around them, their concept of the organizations they are part of, and how they relate to those people and organizations. [*Psychology* § 1].

33. Cognitive dissonance is the fact when a decision-maker receives facts that are inconsistent with his or her pre-conceived notions, he or she subconsciously tries to eliminate the conflict, sometimes to the point of ignoring facts inconsistent with those preconceived notions. [*Psychology* § 2].

34. Judge Von Wald is a Circuit Court Judge. He is rightfully proud of being a member of the South Dakota Judiciary. He believes that Judges, as a general rule, have legal skills equal to or superior to private practitioners. Consequently, another Judge's decision is to be given great deference. He believes that Judges have a duty to oversee the activities of lawyers who appear before them, including determination whether the fees a lawyer charges is reasonable from a Judge's prospective. He believes the Disciplinary Board is an extension of the Judicial Branch that he is a member of, and that their decisions should be given great deference. For him to conclude that Judge Srstka made various decisions that kept Mr. Flugge at risk of litigation expenses if he did not settle a questionable claim, and that those decisions caused Mr. Flugge to take out his frustration and anger on his attorney, Mr. Dorothy, was not consistent with his preconceived notions of how another member of the bench would handle litigation, or how clients react to Judges' decisions. For him to conclude that Judge Tucker had irregularly handled Dorothy Law Firm's collection action against the Hoovers, and that such handling caused Judge Tucker to reach a conclusion that was not consistent with the documentary evidence he admitted into evidence (i.e. he had placed undue emphasis on the oral testimony of the Hoovers when the documentary evidence he admitted into evidence revealed that these oral statements were inconsistent with prior sworn statements of the Hoovers) was not consistent with his preconceived notions of how Judges handle their cases. To accept the fact that the Disciplinary Board had based its decision in considerable part on the validity of Judge Tucker's findings and opinions, and there was serious question as to the validity of those findings and opinions, was inconsistent with his preconceived notions of the validity of Judge's decisions and the Disciplinary Board's right to rely on such decisions. To have accepted these facts would have caused significant cognitive dissonance. So, the facts Judge Von Wald's mind focused on and gave weight to were those that were consistent with his preconceived notions and that eliminated cognitive dissonance. He could not empathize with Mr. Dorothy because, *as a Judge, he could not imagine being told he would not receive a month's salary because of the outcome of a matter he handled,* which is what the Hoovers did to Mr. Dorothy. (Emphasis added).

35. Rory King is an attorney. He is rightfully proud of being a private practitioner. He believes that private practitioners, as a general rule, have legal skills equal to or superior to those of Judges. He does not receive a salary from the judicial branch of the government. He receives his income by being paid by a variety of private citizens and private businesses who retain him to represent them. He operates in the business world of private contracts, where there is a wide variety of types and quality of legal services rendered depending upon what the client wants and will pay for. *He does not operate in the structured governmental world of statutes, rules, regulations, and guaranteed salaries,* until he handles litigation. As an experienced trial lawyer, he is acutely aware that Judges and trial lawyers are human and often unintentionally make mistakes as they perform their respective tasks in good faith. As an attorney who represents attorneys accused of legal malpractice, he is acutely aware that clients, disgruntled by the decisions of Judges and Juries, accuse their attorneys of a wide variety of wrongdoing when the decision of the Judge or Jury is adverse to them. His mind focused on those facts which establish that both Mr. Flugge and the Hoovers were very demanding clients who decided to punish their lawyer when they did not get the decision they wanted from the judges handling their cases, even though they were intimately involved in the handling of their legal matters and had authorized and approved all of the attorney's actions in the matters. And, they were willing to make *false statements under oath to* accomplish their objectives of punishing their lawyer. (Emphasis added).

36. On page 21, *The Psychology of Judgment and Decision Making,* concluding its discussion on selective perception, states: Consequently, before making an important judgment or decision, it often pays to pause and ask a few key questions: Am I motivated to see things a certain way?

[¶ 60.] Further, Dorothy argues that if he has two attorneys testify that in their opinion there was no conduct by Dorothy which violated any provisions of the Rules of Professional Conduct, the court should abdicate their decision-making authority to these practitioners. Dorothy seems to forget that the final decision on discipline is with this Court and not with any experts. Certainly, expert testimony can be considered, but this Court is not obligated to accept it hook, line, and sinker. After reviewing this voluminous record, I am reminded of a quote attributed to Abraham Lincoln which I heard for the first time back in law school, "A man who represented himself had a fool for a client." *See Taylor v. State,* 20 Md.App. 404, 316 A.2d 296, 298 (1974).

[¶ 61.] Dorothy concluded by requesting that this Court "view the facts and documents objectively, without selective perception and without ignoring or giving little weight to facts which cause cognitive dissonance[.]" Counsel can rest assured that this matter has been impartially reviewed with no preconceived thoughts as to what the outcome should be, notwithstanding being the recipient of a guaranteed salary and not having been in the private practice for a number of years. Although Dorothy might not agree with the final decision on discipline, so be it, and he is actually free to chastise the decision, since this Court places no muzzle on a person's right to express their opinions.

[¶ 62.] This Court has considered numerous attorney discipline cases which have resulted in public censure. In *Discipline of Lacey,* 283 N.W.2d 250, 250–51 (S.D. 1979), attorney Lacey, a well-respected attorney of over fifty years, made remarks about state courts being incompetent and crooked. During his professional career, Lacey was elected to ten terms in the South Dakota House of Representative. *Id.* at 253. However, Lacey was later diagnosed with muscular dystrophy and, at oral arguments, Lacey's condition deteriorated to the extent that he was confined to a wheelchair. *Id.* We found that Lacey was attempting to zealously represent his client, but due to his deteriorating condition from an incurable disease, Lacey was unable to objectively view the proceeding against him. *Id.* Lacey, however, steadfastly refused to acknowledge his wrongdoing. *Id.* Based upon Lacey's "disavowal of any intention to make similar statements, his long years of active, honorable practice, his service in public office, his deteriorating condition, and his limited ability to engage in the active, day-to-day practice of law," public censure was appropriate. *Id.*

[¶ 63.] In *Discipline of Theodosen,* 303 N.W.2d 104, 105 (S.D.1980), attorney Theodosen exercised undue influence in a will preparation. Theodosen's conduct in requesting appointment as executor of the will which he infected with his undue influence, willingness to serve as attorney, and his subsequent withdrawal of his appointment request only upon the will being challenged, all gave rise to an appearance of impropriety. *Id.* at 107. This Court imposed public censure as the proper discipline of Theodosen.

[¶ 64.] Three years later, in *Discipline of Rensch,* 333 N.W.2d 713, 714 (S.D.1983), attorney Rensch intentionally deceived the court by misrepresenting to a judge about

---

What expectations did I bring into the situation? Would I see things differently without these expectations and motives? Have I consulted with others who don't share my expectations and motives? By asking such questions, decision makers can expose many of the cognitive and motivational factors that lead to biases in perception.

37. To declare that the testimony of respected and experienced lawyers familiar with facts of the dispute are unnecessary and inadmissible in disciplinary proceedings regarding attorneys would prevent the Referee and this Court from having the insight of other attorneys' views or perspectives so, as decision makers, the Referee and this Court can attempt to overcome any preconceived notions and be as open minded and objective in their decision making as possible.

his fee arrangement with the indigent client. Rensch's conduct was found to be a serious breach of professional ethics and prejudicial to the administration of justice; therefore, Rensch was publicly censured. *Id.* at 716.

[¶ 65.] In *Discipline of Kirby*, 336 N.W.2d 378, 379 (S.D.1983), Kirby had neglected to represent the heirs of an estate for 3 years and also failed to promptly respond to letters from the disciplinary board. Kirby admitted his mistakes and identified a multitude of personal problems that led to these mistakes. *Id.* at 380. Based upon all of the circumstances in the case and the fact that there was no showing of financial loss due to the delays, public censure was imposed. *Id.*

[¶ 66.] In *Discipline of Schmidt*, 491 N.W.2d 754, 754 (S.D.1992), Schmidt had filed an affidavit to secure his brother the right to participate in a trial in South Dakota, but had falsely stated on the affidavit that his brother had NOT had disciplinary actions filed against him. We found that Schmidt's omission constituted a misrepresentation to the court and was "essentially a false statement of material fact." *Id.* at 755. This Court ultimately found that the proper discipline of Schmidt for his intentional omission was public censure. *Id.* at 756.

[¶ 67.] This Court, in *Discipline of Kallenberger*, 493 N.W.2d 709, 710 (S.D.1992), was faced with attorney Kallenberger's guilty plea for failure to file sales tax returns. Kallenberger had repeatedly filed his returns late. *Id.* Public censure was imposed because Kallenberger's repeated conduct of late filings showed an indifference to his legal obligations. *Id.* at 712. The same year as *Kallenberger*, this Court heard D*iscipline of Taylor*, 498 N.W.2d 200, 200 (S.D.1993), where an attorney, Taylor, made untrue representations to his clients about the progress of the case through the legal system. In awarding public censure, this Court noted that Taylor had confessed his wrongdoing and had cooperated with the disciplinary

board. *Id.* In addition, other than this instance, Taylor's performance "has always been highly professional." *Id.* Finally, Taylor had also displayed his willingness to take whatever steps possible to ensure that this would not happen again. *Id.*

[¶ 68.] In *Discipline of Bihlmeyer*, 515 N.W.2d 236, 237 (S.D.1994), the disciplinary action arose out of Bihlmeyer's handling of contingent fees. While Bihlmeyer's conduct of overcharging was dishonest and prejudicial to the profession, public censure was awarded. *Id.* at 239. Bihlmeyer had admitted that he made the misrepresentations about the contingent fees, and apologized for his actions. *Id.* He had also made efforts to rectify his mistakes and had fully compensated his client after his misconduct. *Id.* In awarding public censure, we noted that although Bihlmeyer's conduct of rectifying his mistake "does not absolve [him] from discipline, it certainly constitutes conduct on his part to correct his error." *Id.*

[¶ 69.] In *Discipline of Mines*, 523 N.W.2d 424, 425 (S.D.1994), Mines told the circuit judge that he had filed a complaint in federal court which actually had not yet been filed. Upon learning it had not been filed, the attorney did not tell the judge, nor did he try any other means to correct the situation. *Id.* This Court noted that giving Mines the "benefit of the doubt" that his misstatement to the circuit judge was made in good faith, the fact remains, Mines continued his silence after learning of the non-filing. *Id.* at 427. Therefore, we found that because deceit did exist, no discipline less severe than a public censure would be considered. *Id.* at 426. Ultimately, this Court imposed the discipline of public censure after noting that Mines did express regret for his wrongdoing. *Id.* at 427.

[¶ 70.] Finally, in our most recent public censure case, *Discipline of Claggett*, 544 N.W.2d 878, 879 (S.D.1996), the guardianship estate's attorney (Claggett) borrowed funds from the estate and later repaid

them. In imposing a judgment of public censure, this Court found that a severe sanction was not appropriate because Claggett had no prior misconduct pattern, Claggett intends to refrain from working on future guardianships, Claggett's misconduct arose from a unique family relationship and the likelihood of its reoccurrence is unlikely, Claggett has changed his office practice and, finally, Claggett had acknowledged his misconduct and appeared repentant to the Court. *Id.* at 880.

[¶ 71.] There is no question in my mind that Dorothy is convinced that his spin on the complaints, testimony of various witnesses, and contents of the documentary evidence is one hundred percent accurate. As well, he should be. I must say that I do not view the case in the same light. In preparing written arguments for consideration on appeal, George Kennedy et al., *The Writing Book* 36 (1984) states "[a]sk yourself the two most important questions: 'Do I understand this?' 'Can I explain it to my reader?' Don't be satisfied until the answer to both is yes." After reviewing Dorothy's final response in this matter, which contained an assault on how the referee's gray matter functioned in his decision-making process, I would have to say my answer to question two above would be "no." Whether or not to impose discipline is to be decided on a case by case basis, but we can review past precedent, set forth above, in deciding whether or not to impose discipline. In my opinion, a public censure in this case is justified and amounts to a minimal imposition rather than a maximum imposition which could be imposed under the options contained in the statute.